S13A1084. DEAL et al. v. COLEMAN et al.
S13A1085. KIA MOTORS MANUFACTURING GEORGIA, INC. et al. v. COLEMAN et al.
(751 SE2d 337)

BLACKWELL, Justice.

When Kia Motors Manufacturing Georgia, Inc. opened a manufacturing facility in West Point, the Technical College System of Georgia undertook to provide technical and vocational training — as a part of its Quick Start program[1] — to the workers whom Kia hired for the new facility. Years later, Krystal Coleman, Sabrina Robinson Bolston, Tim Durden, and Darrell Strawbridge each submitted a request to the Technical College System pursuant to the Open Records Act,[2] seeking to inspect certain records concerning the hiring

---

[1] The Quick Start program is intended "to provide special quick start training to meet the employment training needs of new and expanding industry[,] as well as certain existing industries which may qualify under rules established by the State Board of the Technical College System of Georgia." OCGA § 20-4-40.

[2] OCGA § 50-18-70 et seq.

practices of Kia.[3] The Technical College System refused on several grounds to make the requested records available for inspection, and Coleman, Bolston, Durden, and Strawbridge then filed a lawsuit to compel their production.[4] In 2012, while the lawsuit was pending, the General Assembly amended the Open Records Act, and among other revisions, it added OCGA § 50-18-72 (a) (47), which excepts certain records concerning the Quick Start program from public inspection. The Technical College System and Kia then moved to dismiss the lawsuit,[5] asserting that paragraph 72 (a) (47) excepts every record that Coleman, Bolston, Durden, and Strawbridge requested. Without deciding the extent to which paragraph 72 (a) (47) applies to the requested records, the trial court denied the motions to dismiss, concluding that it would be unconstitutional in any event to apply paragraph 72 (a) (47) in a pending lawsuit. The Technical College System and Kia appeal,[6] and we conclude that paragraph 72 (a) (47) applies by its terms in this case, and we conclude as well that its application in this case is constitutional. For these reasons, we reverse the decision of the trial court. But we cannot say from the pleadings alone that *every* record requested is excepted from public inspection under paragraph 72 (a) (47), and so, we also remand for the trial court to determine the extent to which the requested records are so excepted.

1. We first consider whether OCGA § 50-18-72 (a) (47) — on its face, and assuming its constitutionality — applies at all in this case.[7]

---

[3] According to their pleadings, Coleman, Bolston, Durden, and Strawbridge are affiliated with the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), and Coleman, Bolston, and Strawbridge applied for jobs at the Kia facility in West Point but were not hired. By their requests to inspect records, they say, they are seeking to substantiate allegations that Kia did not hire workers affiliated with the UAW and that the Technical College System may have abetted that hiring practice. These appeals, however, concern only whether they are entitled to inspect the requested documents, and the appeals do not concern the underlying allegations against Kia and the Technical College System.

[4] They named Governor Nathan Deal and Commissioner Ronald Jackson of the Technical College System in their official capacities as defendants in the lawsuit. To keep it simple, we refer in this opinion to Governor Deal and Commissioner Jackson — since they are named only as representatives of the Technical College System — as the "Technical College System."

[5] Kia earlier had intervened in the lawsuit as an additional defendant.

[6] When the trial court denied the motions to dismiss, it certified its decision for immediate review, and the Technical College System and Kia timely filed applications for interlocutory review, see OCGA § 5-6-34 (b), which we granted. By the way, this Court — not the Court of Appeals — has jurisdiction of these appeals because they concern the constitutionality of a statute. See Ga. Const. of 1983, Art. VI, Sec. VI, Par. II.

[7] The trial court avoided this question altogether, instead jumping straight to the constitutional question. The trial court should have resolved the statutory question first. See *Bd. of Tax Assessors v. Tom's Foods*, 264 Ga. 309, 310 (444 SE2d 771) (1994) ("[T]his court will never decide a constitutional question if the decision of the case presented can be made upon other grounds." (Citation and punctuation omitted)). See also *Northwest Austin Municipal Utility*

Paragraph 72 (a) (47) excepts the following records from public inspection under the Open Records Act:

> Records related to a training program operated under the authority of Article 3 of Chapter 4 of Title 20 disclosing an economic development project prior to a binding commitment having been secured, relating to job applicants, or identifying proprietary hiring practices, training, skills, or other business methods and practices of a private entity.

OCGA § 50-18-72 (a) (47).[8] No one disputes that the technical and vocational training provided to Kia workers by the Technical College System as a part of its Quick Start program is a "training program operated under the authority of Article 3 of Chapter 4 of Title 20." See OCGA § 20-4-40 et seq. But the appellees contend that the statutory exception in paragraph 72 (a) (47) is limited in time and applies only for so long as "[no] binding commitment ha[s] been secured." Because the binding commitment of Kia to open its facility in West Point was secured years ago, before they asked to inspect any records, paragraph 72 (a) (47) does not apply at all, they say, in this case. About this, the appellees are mistaken.

(a) We consider first whether OCGA § 50-18-72 (a) (47) applies by its terms only for so long as "[no] binding commitment ha[s] been secured." When we consider the meaning of a statute, "we must presume that the General Assembly meant what it said and said what it meant." *Arby's Restaurant Group, Inc. v. McRae*, 292 Ga. 243, 245 (1) (734 SE2d 55) (2012) (citation omitted). To that end, we must afford the statutory text its "plain and ordinary meaning," *City of Atlanta v. City of College Park*, 292 Ga. 741, 744 (741 SE2d 147) (2013) (citation and punctuation omitted), we must view the statutory text in the context in which it appears, *Hendry v. Hendry*, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012), and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English

---

*Dist. No. 1 v. Holder*, 557 U. S. 193, 206 (II) (129 SCt 2504, 174 LE2d 140) (2009) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." (Citations and punctuation omitted)); *Cardinal Chem. Co. v. Morton Intl., Inc.*, 508 U. S. 83, 99 (IV) (113 SCt 1967, 124 LE2d 1) (1993) (courts should "decid[e] cases on statutory rather than constitutional grounds when both alternatives are available" (citation omitted)).

[8] Paragraph 72 (a) (47) goes on to define "economic development project" as "a plan or proposal to locate a business, or to expand a business, that would involve an expenditure of more than $25 million by the business or the hiring of more than 50 employees by the business." OCGA § 50-18-72 (a) (47).

language would. See *Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397) (2013). Consequently, courts sometimes refer to the rules of English grammar, see, e.g., *Barnhart v. Thomas*, 540 U. S. 20, 26 (II) (124 SCt 376, 157 LE2d 333) (2003), inasmuch as those rules are the guideposts by which ordinary speakers of the English language commonly structure their words, and the legislature "is presumed to know . . . the rules of grammar."[9] *United States v. Goldenberg*, 168 U. S. 95, 103 (18 SCt 3, 42 LE 394) (1897). Applying these principles, if the statutory text is "clear and unambiguous," we attribute to the statute its plain meaning, and our search for statutory meaning is at an end. See *Opensided MRI of Atlanta v. Chandler*, 287 Ga. 406, 407 (696 SE2d 640) (2010).

Here, OCGA § 50-18-72 (a) (47) naturally and reasonably admits of only one meaning, and it is not the one that the appellees urge. Paragraph 72 (a) (47) applies, of course, only to certain records "related to a [Quick Start] training program." The particular Quick Start records to which it applies are identified by three participial phrases: "disclosing an economic development project"; "relating to job applicants"; and "identifying proprietary hiring practices, training, skills, or other business methods and practices of a private entity." That each of these participial phrases identifies a separate and distinct class of records to which the exception applies is signaled quite clearly by the commas that separate each participial phrase, see Garner, A Dictionary of Modern American Usage p. 537 (1998), especially the serial comma — followed immediately by the disjunctive "or" — that separates the second and third participial phrases. See id. at 253 ("whether to use the serial comma . . . is more vehemently argued than any other punctuation issue . . . , but [use of the serial comma is the only method that] is ironclad in avoiding unnecessary ambiguities"). See also Strunk, White & Kalman, The Elements of Style § I (2), p. 3 (2000). The adverbial phrase on which the appellees rely — "prior to a binding commitment having been secured" — follows immediately after the first participial phrase, "disclosing an economic development project," and it can only be reasonably understood to modify that participial phrase and no others. See 2A Singer, Statutes and Statutory Construction § 47:33,

---

[9] That is not to say that we adhere unyieldingly to the rules of grammar when contrary indicia of meaning appear in the statutory text. See *Barnhart*, 540 U. S. at 26 (II). In a number of cases, we have rejected a grammatical construction where contrary indicia of meaning appeared. See, e.g., *Merritt v. State*, 286 Ga. 650, 651 n. 3 (690 SE2d 835) (2010); id. at 653-654 (Nahmias, J., concurring specially); *Sumter County v. Allen*, 193 Ga. 171, 176 (17 SE2d 567) (1941). In other cases, we have found the grammatical signals to be ambiguous. See, e.g., *Haley v. State*, 289 Ga. 515, 524 (2) (b) (712 SE2d 838) (2011).

p. 369 (6th ed. 2000) ("Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent."). Accordingly, Quick Start records "disclosing an economic development project" are excepted only to the extent that no "binding commitment ha[s] been secured," but the exception for Quick Start records "relating to job applicants" or "identifying proprietary hiring practices, training, skills, or other business methods and practices of a private entity" is not so limited.[10] See OCGA § 50-18-72 (a) (47). The Technical College System and Kia rely in this case upon the latter parts of the exception, and their reliance upon those parts is not foreclosed by the fact that Kia committed long ago to open its facility in West Point.[11]

(b) With this understanding of OCGA § 50-18-72 (a) (47), we next consider the extent to which this statutory exception — on its face, and again assuming its constitutionality — applies in a lawsuit pending at the time of its enactment and arising from a request made before its enactment. Generally speaking, the retroactive application of statutes has long been disfavored in the law, even if it is not always forbidden. See *Landgraf v. USI Film Products*, 511 U. S. 244, 265 (IV) (A) (114 SCt 1483, 128 LE2d 229) (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine older than our Republic."). For that reason, courts usually insist upon some clear indication in the statutory text

---

[10] Our understanding of OCGA § 50-18-72 (a) (47) squares with common sense. If records "relating to job applicants" were excepted only to the extent that no "binding commitment ha[s] been secured," the "relating to job applicants" part of the exception would be essentially without meaning, and we do not read a statute in a way that "renders any part of the statute meaningless." *Expedia, Inc. v. City of Columbus*, 285 Ga. 684, 689 (4) (681 SE2d 122) (2009). After all, common sense tells us that people do not apply for positions until it is known that there are positions that might have to be filled, and especially with respect to new employers, it cannot be known that there are positions that might have to be filled until after the coming of the new employer is announced. Such an announcement, of course, typically would only follow a "binding commitment." Common sense is not the only indicia of meaning, and we suppose that a legislature might enact a statute that defies it. Nonetheless, we presume that the law generally is meant to square with common sense, and in any event, common sense always is a good way to confirm that our understanding of the statutory text is the right one. See *Thornton v. Clarke County School Dist.*, 270 Ga. 633, 634 (1) (514 SE2d 11) (1999) ("The construction of statutes must square with common sense and sound reasoning." (Citation and punctuation omitted)).

[11] The appellees also advance a number of policy arguments in support of their mistaken understanding of OCGA § 50-18-72 (a) (47), urging us to strike the balance that they prefer between the public interest in open government and the public interest in the secrecy that sometimes may be necessary to promote economic development. But striking the right balance between competing legitimate policy interests is a political question, and this Court is concerned only with legal questions. "As members of this State's judicial branch, it is our duty to interpret the laws as they are written." *You v. J.P. Morgan Chase Bank*, 293 Ga. 67, 75 (4) (743 SE2d 428) (2013). We leave political questions to the political branches, and the policy arguments in this case are properly directed to the General Assembly. See id.

that a statute is to be applied retroactively before so applying it.[12] See *Polito v. Holland*, 258 Ga. 54, 55 (2) (365 SE2d 273) (1988) ("Generally statutes prescribe for the future and that is the construction to be given unless there is a clear contrary intention shown." (Citations omitted)). Such a clear indication appears in the amendment that enacted paragraph 72 (a) (47), which provides explicitly that "[OCGA § 50-18-72 (a) (47)] shall apply to any request for public records made prior to the effective date of this Act." Ga. L. 2012, p. 218, § 18. Accordingly, paragraph 72 (a) (47) applies in this case, unless our Constitution forbids it, a question to which we now turn.

2. Even when the General Assembly clearly provides that a law is to be applied retroactively, our Constitution forbids statutes that apply retroactively so as to "injuriously affect the vested rights of citizens."[13] *Bullard v. Holman*, 184 Ga. 788, 792 (2) (193 SE 586) (1937). The appellees argue that, applied retroactively, OCGA § 50-18-72 (a) (47) impairs their "vested right" to inspect the records that they requested. They have such a "vested right," they say, because the version of the Open Records Act in effect at the time they made their requests conferred a "right" of access to the records they seek. That "right" vested, they continue, when they made their requests, or at least when they filed their lawsuit. The Technical College System and Kia dispute that the former Open Records Act conferred any "rights," characterizing the access to public records

---

[12] We have said before that statutes merely affecting judicial procedures and remedies are different and may be presumptively retroactive: "[W]here a statute governs only procedure of the courts, including the rules of evidence, it is to be given retroactive effect absent an expressed contrary intention." *Polito v. Holland*, 258 Ga. 54, 55 (2) (365 SE2d 273) (1988).

[13] Prohibitions of such retroactive laws have long been a part of our constitutional tradition. The Constitution of 1861 prohibited "retroactive legislation injuriously affecting the right of the citizen," Ga. Const. of 1861, Art. I, Par. XVIII, and the Constitution of 1865 likewise prohibited "retroactive laws injuriously affecting any right of the citizen." Ga. Const. of 1865, Art. I, Par. XIV. Although retroactive legislation was not addressed explicitly in the Constitution of 1868, see *Hammack v. McDonald*, 153 Ga. 543, 546 (113 SE 83) (1922), the Constitution of 1877 provided that "[n]o . . . retroactive law . . . shall be passed." Ga. Const. of 1877, Art. I, Sec. III, Par. II. That prohibition was carried forward into successive constitutions, including our present Constitution. See Ga. Const. of 1983, Art. I, Sec. I, Par. X ("No . . . retroactive law . . . shall be passed."). See also Ga. Const. of 1976, Art. I, Sec. I, Par. VII (same); Ga. Const. of 1945, Art. I, Sec. III, Par. II (same). Although the contemporary prohibition seems absolute and unequivocal, this Court held nearly 76 years ago that "our [C]onstitution forbids the passage of only those retroactive, or rather retrospective, laws which injuriously affect the vested rights of citizens," relying in part on the general principle of American law that "a [s]tate constitution broadly prohibiting the passage of retroactive laws is to be restricted as to apply only to enactments affecting or impairing vested rights." *Bullard v. Holman*, 184 Ga. 788, 791-792 (2) (193 SE 586) (1937) (citing 6 R.C.L. 307, § 293 (1915)). Since *Bullard*, we have consistently adhered to that holding. See, e.g., *Fulton County v. Action Outdoor Advertising*, 289 Ga. 347, 351 (1) (711 SE2d 682) (2011); *Jackson County Bd. of Health v. Fugett Constr., Inc.*, 270 Ga. 667, 668 (2) (514 SE2d 28) (1999); *Goldrush II v. City of Marietta*, 267 Ga. 683, 694 (7) (482 SE2d 347) (1997); *Smith v. Abercrombie*, 235 Ga. 741, 749 (221 SE2d 802) (1975).

afforded under the former Act instead as a mere "privilege." The trial court considered whether the former Act conferred "rights" or "privileges," and it decided that the former Act is better characterized as having conferred a "right" of access. Accordingly, the trial court concluded, the appellees have a "vested right" to inspect the requested records, and it would be unconstitutional to apply paragraph 72 (a) (47) in this case. With these conclusions, we disagree.

(a) Our constitutional analysis begins with an inquiry into the nature of "vested rights," a legal concept with which this Court has dealt from time to time, but one that has not been defined consistently and with precision.[14] In the search for "vested rights," some Georgia precedents — mostly decisions of our Court of Appeals, but at least one of our decisions as well — distinguish between "rights" and mere "privileges," as the parties and the trial court in this case have done. See, e.g., *Fulton Bag & Cotton Mills v. Williams*, 212 Ga. 783, 785 (1) (95 SE2d 848) (1956) ("A person has no vested right in statutory privileges or exemptions." (Citation omitted)); *Evans v. Belth*, 193 Ga. App. 757, 758 (2) (388 SE2d 914) (1989) (same); *Atha v. Jackson Atlanta, Inc.*, 159 Ga. App. 433, 436 (283 SE2d 654) (1981) (same); *Goolsby v. Regents of Univ. System of Ga.*, 141 Ga. App. 605, 607 (1) (234 SE2d 165) (1977) (same), overruled on other grounds in *Donaldson v. Dept. of Transp.*, 262 Ga. 49 (414 SE2d 638) (1992). Other precedents of this Court, however, seem to pay the distinction no mind. See, e.g., *Jackson County Bd. of Health v. Fugett Constr., Inc.*, 270 Ga. 667, 670 (2) (514 SE2d 28) (1999) ("[I]t is obvious that many *rights, privileges,* and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any legal sense." (Citation omitted; emphasis supplied)); *Goldrush II v. City of Marietta*, 267 Ga. 683, 697 (9) (482 SE2d 347) (1997) (same). More important, the distinction is one without real meaning in this context. Used in a legal sense, a "right" is most commonly understood to mean "[a] power, *privilege*, or immunity secured to a person by law," Black's Law Dictionary (9th ed. 2009) (emphasis supplied), and a "privilege" is most commonly understood to mean "[a] special legal *right*, exemption, or immunity granted to a person or class of persons." Id. (emphasis supplied). Inasmuch as a "right" is understood to be a sort of "privilege," and insofar as a "privilege" is understood to be a kind

---

[14] The definition of "vested rights" is a bit hazy in American law generally, not just in Georgia. 2 Statutes and Statutory Construction, supra, § 41:6, pp. 423-426 ("It is impossible to discover the precise meaning of the term ['vested rights'] through which all of the decisions can be consistently explained."). We do not attempt today to forever disperse the haze, only to cut through it far enough to resolve the issues now before us.

of "right," any distinction between "rights" and "privileges" is a distinction without a difference. To the extent that *Fulton Bag & Cotton Mills*, 212 Ga. at 785 (1), *Evans*, 193 Ga. App. at 758 (2), *Atha*, 159 Ga. App. at 433, and *Goolsby*, 141 Ga. App. at 607 (1), suggest that courts must distinguish between "rights" and "privileges" in considering whether a law can apply retroactively, we disapprove those decisions.

In other cases, this Court has said that "the term vested rights . . . means interests which it is proper for the state to recognize and protect and of which the individual cannot be deprived arbitrarily without injustice." *Hayes v. Howell*, 251 Ga. 580, 584 (2) (308 SE2d 170) (1983) (citations and punctuation omitted). See also *Fulton County v. Action Outdoor Advertising*, 289 Ga. 347, 349 (1) (711 SE2d 682) (2011) (citing *Hayes*); *Jackson County Bd. of Health*, 270 Ga. at 668-669 (2) (same); *Recycle & Recover, Inc. v. Georgia Bd. of Natural Resources*, 266 Ga. 253, 254 (2) (466 SE2d 197) (1996) (same). No doubt, these statements are accurately descriptive of "vested rights." After all, no one reasonably could dispute that "vested rights" are "interests which it is proper for the state to recognize and protect," or that they are "interests . . . of which the individual cannot be deprived arbitrarily without injustice." But these descriptive statements do not amount to a meaningful standard that can be applied to discern whether a statutory right might properly be capable of vesting.[15] See 2 Statutes and Statutory Construction, supra, § 41:6, p. 426 ("Most of the numerous attempts at definition are essentially circuitous in nature, as in the pronouncement that 'a vested right, as that term is used in relation to the constitutional guarantees, implies an interest which it is proper for the state to recognize and protect, and of which the individual may not be deprived arbitrarily without injustice.' " (Citations omitted)).

We also have noted a distinction in some cases between "substance" and mere "procedure," explaining that "there are no vested rights in any course of procedure." *Mason v. Home Depot U.S.A., Inc.*, 283 Ga. 271, 278 (4) (658 SE2d 603) (2008) (citation and punctuation omitted). See also *EHCA Cartersville v. Turner*, 280 Ga. 333, 337 (3) (626 SE2d 482) (2006) (same); *Day v. Stokes*, 268 Ga. 494, 495 (491 SE2d 365) (1997) (same); *Hunter v. Johnson*, 259 Ga. 21, 22 (2) (376 SE2d 371) (1989) ("Ordinarily, there is no constitutional impediment

---

[15] The appellees invite us to employ these descriptive statements as a standard. But how are we to determine what interests are substantial enough that "it is proper for the state to recognize and protect [them]"? To employ such a standard would be to say that "vested rights" are whatever judges think ought to be "vested rights." And that is no standard at all. Accordingly, we decline the invitation.

to giving retroactive effect to statutes that govern only procedure of the courts." (Citations omitted)); *Ballew v. Riggs*, 244 Ga. 232, 234 (1) (259 SE2d 482) (1979) ("No person has a vested right in any course of procedure . . . ." (Citation and punctuation omitted)). This distinction is a more meaningful one, and it is a distinction that is familiar to the courts, even if the line between "substance" and "procedure" sometimes can seem a bit hazy. Moreover, this distinction has proved to be a sufficient standard in many cases, insofar as it resolves any constitutional doubt about the retroactive application of a statute affecting only procedural rights. See, e.g., *Mason*, 283 Ga. at 278-279 (4); *EHCA*, 280 Ga. at 337-338 (3); *Hunter*, 259 Ga. at 22 (2); *Ballew*, 244 Ga. at 233-234 (1). Here, no one disputes that the right of access to public records conferred by the Open Records Act is something of substance. But to say that no right of "procedure" is a "vested right" is not to say that every right of "substance" is capable of vesting. Although the distinction between "substance" and "procedure" is an important and meaningful one, we conclude that this distinction alone is not sufficient to mark the boundary between "vested rights" and those that may properly be impaired by retroactive legislation. To mark the boundary, we must consider not only the nature of the right, but also to whom it is afforded.

American law long has distinguished between the "public rights belonging to the people at large" and the "private unalienable rights of each individual." *Lansing v. Smith*, 4 Wend. 9, 21 (N.Y. Sup. Ct. of Errors 1829).[16] This distinction has been regarded as especially important in cases concerning the extent to which legislation can modify rights retroactively. See, e.g., *Holen v. Minneapolis-St. Paul Metro. Airports Comm.*, 84 NW2d 282, 287 (5) (Minn. 1957) ("Clearly, there is a definite distinction between the effect to be given to a retroactive statute when it relates to private rights and when it relates to public rights."); *Bradford v. Suffolk County*, 15 NYS2d 353, 363 (N.Y. App. Div. 1939) ("There is a definite distinction between the effect to be given to a retroactive statute when it relates to private rights and when it relates to public rights."); *Robinson v. City of Winfield*, 219 P 273, 274 (Kan. 1923) (distinction between public and private rights with respect to effect of retroactive legislation "is a distinction which has always been recognized"). Private rights may become vested in particular persons, and when they are vested, our Constitution does not permit those rights to be denied to those

---

[16] *Lansing* was cited for this very principle by the United States Supreme Court in *Appleby v. New York*, 271 U. S. 364, 381-382 (46 SCt 569, 70 LE 992) (1926), which characterized *Lansing* as a "leading" case.

persons by subsequent legislation. But this principle does not apply with respect to public rights, which are shared by the People in common, and which can be modified by the People — through their elected representatives — as they see fit. See *Hodges v. Snyder*, 261 U. S. 600, 603 (2) (43 SCt 435, 67 LE 819) (1923) ("It is true, as they contend, the private rights of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation . . . . This rule . . . does not apply to a suit brought for the enforcement of a public right, which . . . may be annulled by subsequent legislation . . . ."). See also *Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U. S. 421, 431-432 (15 LE 435) (1855) (to the extent that prior judgment was to enforce a public right, it properly could be repudiated by subsequent legislation, although such legislation could not repudiate judgment to vindicate a private right); *Georgia Assn. of Retarded Citizens v. McDaniel*, 855 F2d 805, 812 (III) (11th Cir. 1988) (recognizing that legislature might properly overturn judgment to enforce public rights but not one founded upon private rights); *Inman v. R. Comm. of Texas*, 478 SW2d 124, 128 (Tex. App. 1972) ("The rule . . . which recognizes that *private rights* of parties, which have become vested under judgment of a Court, cannot be taken away by subsequent legislation but must thereafter be enforced by the Court regardless of such legislation, does not apply to a suit brought for the enforcement of a *public right*, which, even after it has been established by the judgment of a court, may be annulled by subsequent legislation and should not thereafter be enforced." (Emphasis in original)); *Holen*, 84 NW2d at 288 (5) ("In the instant case[,] plaintiff taxpayers are seeking the enforcement of a public right, a right in which they have no more interest than any other taxpayer, a right which is, therefore, subject to divestment by curative legislation after judgment, even though in the particular suit the action was brought by individuals primarily for their own benefit."); *People v. B. Mercil & Sons Plating Co.*, 37 NE2d 839, 850 (Ill. 1941) ("The fact that the curative act in this case was passed after the judgment was entered in the trial court would not affect private rights, because the suit is for the enforcement of a public right . . . ." (Citations omitted)); *Bradford*, 15 NYS2d at 363 ("[P]laintiffs are proceeding as taxpayers to establish a public right and not to obtain any private right or property."); *State ex rel. Newbury v. Patterson*, 20 A 828, 829 (N.J. 1890) ("It is not a private right or interest, but a public right . . . ."); *Newton v. Commrs. of Mahoning County*, 1876 Ohio Misc. LEXIS 46, *5 (Ohio Ct. of Common Pleas 1876) ("It is the private rights that are protected by the Constitution, and they cannot be violated or impaired by legislation. We think the plaintiffs had no right to look upon the language [of a prior version of the statute] as a grant of private rights

from the General Assembly, but should have considered it only as legislation for the public good, and subject to future revision and repeal.").

Like our sister states and the federal courts, Georgia recognizes a distinction between public and private rights. See, e.g., OCGA § 9-6-24 ("Where the question is one of public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown, but it shall be sufficient that a plaintiff is interested in having the laws executed and the duty in question enforced."); *Rothschild II v. Columbus Consolidated Govt.*, 285 Ga. 477, 479 (678 SE2d 76) (2009) (noting that Georgia law "confers standing to seek the writ [of mandamus] in those cases wherein the defendant owes a public duty which the plaintiff, as a member of the public, is entitled to have enforced." (Citation and punctuation omitted)). Although our precedents do not expressly employ this distinction with respect to retroactive legislation, a few of our precedents at least hint at the distinction.[17] In *Bullard*, for instance, this Court held that a repeal of a statute might properly apply retroactively, noting that the repealed statute had been "enacted for the protection of the public, and not for the benefit of any particular individual or calling." 184 Ga. at 791 (2). More recently, in *Jackson County Bd. of Health*, we held that a statutory amendment that altered the requirement of statewide approval of county sewage management systems could apply retroactively, explaining that the former "statewide approval was for the benefit of the counties and cannot be seen as a license granted to a manufacturer." 270 Ga. at 670 (2) (punctuation omitted). Moreover, our precedents — certainly our more recent precedents — generally are at least consistent with the distinction. See, e.g., *Action Outdoor Advertising*, 289 Ga. at 350-351 (1) (property owners in a previously unincorporated part of a county have no vested right to continue to maintain their property in an unincorporated area, subsequent incorporations of new cities and annexations into existing cities notwithstanding); *DeKalb County v. State of Ga.*, 270 Ga. 776, 778-779 (1) (512 SE2d 284) (1999) (new statutory requirements with respect to distribution of tax proceeds did not impair any vested right of county in receipt of proceeds under prior law); *Coastal Ga. Regional Dev. Center v. Higdon*, 263 Ga. 827, 831 (2) (439 SE2d 902) (1994) (defendants had no vested right with respect to lack of authority by

---

[17] As one commentator has explained, not all courts have expressly identified the distinction between public and private rights as one to be considered when assessing whether legislation might properly apply retroactively, but many of their decisions nevertheless can be explained by that distinction. Woolhandler, "Public Rights, Private Rights, and Statutory Retroactivity," 94 Geo. L. J. 1015, 1057 (2006).

Department of Community Affairs to conduct audits under prior law); *McIntyre v. Miller*, 263 Ga. 578, 578-579 (1) (436 SE2d 2) (1993) (prospective public officer had no vested right in prior law concerning eligibility to hold public office). Cf. *Mikesell v. RP Motorsports, Inc.*, 283 Ga. 476, 476-477 (660 SE2d 534) (2008) (offer of settlement provisions of Tort Reform Act of 2005 could not be applied constitutionally in a lawsuit between private parties for money damages, insofar as a private right of action accrued to the plaintiff prior to the effective date of the Act). In light of the settled distinction in American law between public and private rights, considering that this distinction is consistent with Georgia law, and given the settled implications of the distinction with respect to the retroactive application of statutes, we conclude that "vested rights" must be private rights, and public rights — those rights that belong to the People in common — can be modified by the elected representatives of the People prospectively or retroactively, as they see fit.

(b) With these principles in mind, we now consider whether the right of access to public records conferred by the former version of the Open Records Act is a public or private right. The text and structure of the former Act suggest that its right of access is a public one. Prior to the amendment, the Act defined those who might properly request an inspection of public records solely by reference to their membership in the People.[18] See, e.g., OCGA §§ 50-18-70 (b) (2012) (public records "shall be open for personal inspection by any citizen of this state"); 50-18-71 (a) (2012) ("In all cases where an interested member of the public has a right to inspect or take extracts or make copies from any public records, instruments, or documents . . . ."). Although the Act contemplated requests by individual persons to inspect public records, it did not require that a person requesting inspection have, assert, or prove any special or personal interest in the requested records or the information contained therein. See OCGA § 50-18-71

---

[18] The Act today begins with the findings of the General Assembly that led to its enactment, findings that are concerned exclusively with the rights and interests of the public as a whole:

> The General Assembly finds and declares that the strong public policy of this state is in favor of open government; that open government is essential to a free, open, and democratic society; and that *public* access to public records should be encouraged to foster *public* confidence in government and so that the *public* can evaluate the expenditure of public funds and the efficient and proper functioning of its institutions. The General Assembly further finds and declares that there is a strong presumption that public records should be made available for *public* inspection without delay. . . .

OCGA § 50-18-70 (a) (2013) (emphasis supplied). We find reference to "the *public's* right of access" and "*public* access" throughout the Act. See, e.g., OCGA § 50-18-71 (f), (h) (2013) (emphasis supplied).

(b) (2012). And although a custodial agency was required to produce records responsive to the request for inspection, the person who made the request had no special or exclusive access to the records.[19] See id. With respect to actions for judicial enforcement of the Act, it provided that "[s]uch actions may be brought by *any person, firm, corporation, or other entity*," OCGA § 50-18-73 (a) (2012) (emphasis supplied), and the Act notably did not limit the authority to commence an enforcement action to persons who had made a request for records or to persons with a special or personal interest in the requested records.[20] In addition, the Act authorized the Attorney General — who represents the *public* interest, of course — to bring actions to enforce the Act. OCGA § 50-18-73 (a). As a remedy for violations of the Act, a court could award injunctive relief, *Bowers v. Shelton*, 265 Ga. 247, 248-249 (1) (453 SE2d 741) (1995), but the Act did not authorize any person to recover damages. *McBride v. Wetherington*, 199 Ga. App. 7, 8 (403 SE2d 873) (1991). In addition, a court could sanction an agency that negligently violated the Act with civil penalties, and a knowing and willful violation of the Act was a crime. OCGA § 50-18-74 (a). Moreover, consistent with the statutory text and structure, this Court in a number of cases had described the right as a "public right." See, e.g., *McFrugal Rental of Riverdale v. Garr*, 262 Ga. 369, 369 (418 SE2d 60) (1992) ("public's right of access to public records"); *Bd. of Regents of the Univ. System of Ga. v. Atlanta Journal & Atlanta Constitution*, 259 Ga. 214, 217 (4) (b) (378 SE2d 305) (1989) ("right of public access"); *Harris v. Cox Enterprises*, 256 Ga. 299, 299 (348 SE2d 448) (1986) ("The public has a right to public records in Georgia."); *Houston v. Rutledge*, 237 Ga. 764, 764 (229 SE2d 624) (1976) ("right of the public to inspect records"). Cf. *John Doe Agency v. John Doe Corp.*, 493 U. S. 146, 151 (II) (110 SCt 471, 107 LE2d 462) (1989) (about federal Freedom of Information Act, "[it] attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands"). Indeed, in one case, we noted that "the intent of the General Assembly [in enacting the Open Records

---

[19] To the contrary, the Act provided that an agency could respond to a request, for instance, for electronic records by making them available on the internet, OCGA § 50-18-70 (g) (2012), and consistent with that approach, it now provides that an agency may comply with any request by "provid[ing] access to records through a website accessible by the public." OCGA § 50-18-71 (h) (2013).

[20] If the Act provided for an award of attorney fees to a prevailing party in such an action, it might be said that the plaintiff would have a private right at least as to the award of such fees. But although the Act provided for attorney fees, the fees were not automatic for a prevailing party. They instead were available only when a party had acted "without substantial justification," OCGA § 50-18-73 (b) (2012), and in that respect, the fees authorized by the Act were not much different from the fees authorized under the law generally applicable in civil actions. See OCGA § 9-15-14 (a), (b).

Act] was to afford the *public at large* access to public records . . . ." *Griffin-Spalding County Hosp. Auth. v. Radio Station WKEU*, 240 Ga. 444, 447 (3) (241 SE2d 196) (1978) (emphasis supplied).

History points in the same direction. Used in the context of cases concerning retroactive legislation, "private rights" traditionally have been understood to refer to "an individual's common law rights in property and bodily integrity, as well as in the enforcement of contracts." Woolhandler, "Public Rights, Private Rights, and Statutory Retroactivity," 94 Geo. L. J. 1015, 1020 (2006). The right of access afforded by the Open Records Act was unknown at common law. *McBurney v. Young*, ___ U. S. ___ (II) (D) (133 SCt 1709, 185 LE2d 758) (2013). Indeed, "[m]ost founding-era English cases provided that only those persons who had a personal interest in non-judicial records were permitted to access them." Id. And "Nineteenth-century American cases, while less uniform, certainly do not support the proposition that a broad-based right to access public information was widely recognized in the early Republic." Id. Considering the long history of our State, our Open Records Act — the first version of which was enacted in 1959, see Ga. L. 1959, p. 88 — "[is] of relatively recent vintage." *McBurney*, ___ U. S. at ___ (II) (D). The historical context suggests as well that the right afforded by the Open Records Act — both now and as it existed prior to the 2012 amendment — is not in the nature of a personal right, but instead is more fairly characterized as a public one.

Recognition that the former Act afforded a public right also would be consistent with decisions in other jurisdictions that similar statutory schemes may properly be modified retroactively by legislation subsequent to a request to inspect public records or, in some cases, even a lawsuit to compel an inspection. For instance, "the Florida courts have consistently recognized that the right to inspect and copy public records under the Public Records Act is a public right." *Campus Communications, Inc. v. Earnhardt*, 821 S2d 388, 399 (Fla. 5th Dist. 2002). As such, a retroactive amendment of the Florida Public Records Act that carved out a new exception from its disclosure requirements — an exception for autopsy records — was found not to unconstitutionally impair any vested right in the former disclosure requirements. See id. at 401. Under the Maryland Public Information Act, the Maryland Court of Appeals held that a firm requesting certain records — the identities of all persons maintaining an electronic security or alarm system — had no vested right in the production of those records, even by virtue of submitting the request. *Police Patrol Security Systems, Inc. v. Prince George's County*, 838 A2d 1191, 1203 (III) (B) (Md. 2003). As such, the retroactive application of a new statutory exemption for such records was constitutional. See id. at

1203-1204 (III) (B). Even where Congress enacted an exemption from the federal Freedom of Information Act specifically in response to litigation to compel the disclosure of certain records under the Act — exactly what the appellees allege in this case — the United States Court of Appeals for the Ninth Circuit held that the retroactive application of the statutory exemption "would not deprive plaintiffs of any vested right protected by the due process clause of the [F]ifth [A]mendment." *Long v. United States Internal Revenue Service*, 742 F2d 1173, 1184 (IV) (9th Cir. 1984). See also *Southwest Center for Biological Diversity v. United States Dept. of Agriculture*, 314 F3d 1060, 1062 (9th Cir. 2002). In addition, our own Court of Appeals has addressed the retroactive modification of the Open Records Act in two earlier decisions, the only published Georgia decisions to date on this question. Although those decisions did not consider whether the right of access was public or private — they rested instead upon the unsound distinction between "rights" and mere "privileges" — the results of those decisions at least would be consistent with a determination in this case that the right of access is public and, therefore, not a "vested right." See *Evans*, 193 Ga. App. at 758 (2); *Clayton County Hosp. Auth. v. Webb*, 208 Ga. App. 91, 96 (2), n. 3 (430 SE2d 89) (1993) (citing *Evans*).

Based on the text of the former Open Records Act, its structure, its historical context, our prior characterizations of the Act, and the treatment of similar statutes in other jurisdictions, we conclude that the right of access afforded by the former Act is a public right of the People as a whole. As such, it could not vest in any particular persons, whether upon the making of a request for public records, or upon the filing of an action to enforce the public right. Accordingly, there is no constitutional impediment to the retroactive modification of the Act by subsequent legislation.[21] The statutory exception in OCGA § 50-18-72

---

[21] Although it is not critical to our decision today, we briefly note the practical implications of the constitutional arguments urged by the appellees. The General Assembly has defined the records that presumptively are available for public inspection broadly, and it has defined exceptions narrowly. In all, the separately enumerated paragraphs of exceptions contained within the Open Records Act itself now number 48, see OCGA § 50-18-72 (a) (1)-(48), and other exceptions can be found elsewhere in the Code. See OCGA §§ 15-16-10 (a) (10) (exception for courthouse security plans); 45-16-27 (exception for autopsy photographs). No doubt, some public records may contain information that — if publicly disseminated — could do serious harm to some of our fellow citizens, to segments of our business community, or to the public generally. To the extent that the General Assembly has had the foresight to anticipate the disclosure of such records, and the potential harm that might follow, it has enacted exceptions for them. See, e.g., OCGA § 50-18-72 (a) (3) (exception for law enforcement records "reasonably likely to disclose the identity of a confidential source"); (a) (14) (exception for Department of Natural Resources records relating to "the location and character of a historic property" to the extent that "disclosure will create a substantial risk of harm, threat, or destruction to the

(a) (47) constitutionally may be applied in this case,[22] and the trial court erred when it concluded otherwise.

3. Having concluded that OCGA § 50-18-72 (a) (47) applies in this case, and having concluded that nothing in our Constitution forbids its application, we now turn to the implications of these conclusions for the motions of the Technical College System and Kia to dismiss this lawsuit. At least *some* of the records at issue in the lawsuit are records to which OCGA § 50-18-72 (a) (47) applies. In their requests, the appellees asked to inspect the following records:

> 1. All public records prepared, created, maintained or received by or for the [Technical College System] and/or [the Quick

---

property"); (a) (19) (exception for "[r]ecords that reveal [certain personal] information developed, collected, or received by counties or municipalities in connection with . . . the installation, servicing, maintaining, operating, selling, or leasing of burglar alarm systems, fire alarm systems, or other electronic security systems"); (a) (20) (A) (exception for records containing sensitive identifying information of individuals); (a) (21) (exception for records containing sensitive identifying information of public employees); (a) (25) (A) (exception for "[r]ecords the disclosure of which would compromise security against sabotage or criminal or terrorist acts and the nondisclosure of which is necessary for the protection of life, safety, or public property"); (a) (34) (exception for "[a]ny trade secrets obtained from a person or business entity that are required by law, regulation, bid, or request for proposal to be submitted to an agency").

In its efforts to anticipate the dissemination of harmful records, however, the General Assembly cannot reasonably be expected to have perfect foresight. Requests for dangerous information may be made, and only then will the danger become apparent. That has happened in other jurisdictions, and their legislatures have been able to respond appropriately, by enacting legislation to retroactively prevent the release of dangerous or especially sensitive information. See, e.g., *Campus Communications*, 821 S2d at 392 (retroactive legislation to prevent release of autopsy photographs of NASCAR driver Dale Earnhardt, Sr.); *Police Patrol*, 838 A2d at 1200-1201 (III) (B) (emergency retroactive legislation to prevent release of alarm records). If the appellees were right that the Constitution forbids retroactive amendment of the Open Records Act, our General Assembly would be unable to enact emergency retroactive legislation to stop the release of dangerous or especially sensitive information once the records had been requested. See *Landgraf*, 511 U. S. at 267-268 (IV) (A) ("Retroactivity provisions often serve entirely benign and legitimate purposes, [including] to respond to emergencies [and] to correct mistakes . . . .").

[22] The appellees also claim that the retroactive application of OCGA § 50-18-72 (a) (47) would amount to an unconstitutional denial of access to the courts, but these claims do not warrant much discussion. As to the Georgia Constitution, the provision upon which they rely – that "[n]o person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state," Ga. Const. of 1983, Art. I, Sec. I, Par. XII – "was never intended to provide a right of access to the courts, but was intended to provide only a right of choice between self-representation and representation by counsel." *Smith v. Baptiste*, 287 Ga. 23, 24 (1) (694 SE2d 83) (2010) (citations omitted). "[T]here is no express constitutional right of access to the courts under the Georgia Constitution." Id. at 24-25 (1) (citation and punctuation omitted). As for the United States Constitution, the United States Supreme Court has held that, generally speaking, "the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope," *Landgraf*, 511 U. S. at 267 (IV) (A), and this is especially true when the retroactive application only affects public rights. See *Hodges*, 261 U. S. at 603 (2); *Wheeling and Belmont Bridge Co.*, 59 U. S. at 431-432. We see no unconstitutional denial of access to the courts.

Start program] or in their possession from any source concerning hourly employment in Georgia at [Kia], specifically:

> a. Any records related to individual hourly employment applications, including but not limited to: (i) any discussion, correspondence or agreements related to how, when and from whom to solicit applications or (ii) criteria to be used or not used in evaluating applications.

> b. Interview materials, including but not limited to: (i) any discussion, correspondence or agreements related to interview topics or rating of applicants' responses, (ii) documents reflecting or evidencing any rating assigned to an applicant or (iii) notes relating to any applicant.

> c. Recruitment, hiring or training criteria (or materials) related to determining whether an applicant is eligible or ineligible for hire, including any documents evidencing the assessment of applicants for skills, flexibility, "team concept," qualifications and work ethic. . . .

2. Documents related to any communication, interaction, instructions or agreements among and between the [Technical College System] and/or [the Quick Start program] and Kia related to the hourly employee selection process and/or its development and execution.

3. Individual applications for hourly employment at Kia and any data developed from them, including but not limited to the total number of applicants, their names and employment history, the total number of applicants interviewed, the total number of applicants selected for training and any demographic information related to each of the foregoing categories.

4. Documents related to, constituting or evidencing any hiring criteria or materials for employment at Kia.

5. Documents related to, constituting or evidencing any recruitment criteria or materials for hourly employment at

Kia and/or indicating from whom the information was received or to whom such information was provided.

6. Documents related to any pre-employment assessment of applicants for hourly employment at Kia and any data developed from those assessments.

7. Section 9.8 of the March 13, 2006 Site Acquisition Development Agreement (SADA) between Kia, the State of Georgia and various other entities provides that if the State is requested to disclose information pursuant to the Open Records Act that Kia considers to be a trade secret and/or proprietary, the State "will provide the Company with prompt notice" of the request. If the [Technical College System] and/or [the Quick Start program] has provided such a notice to Kia, in response to this or any other Open Records Act request, please provide a copy of such notice and all related correspondence and documents.

8. Correspondence and documents related to the application or utilization of Section 9.3 or 9.8 of the SADA, and the implications of this or other Open Records Act requests under those sections of the agreement.

The records described in parts 1 (a), 1 (b), 3, and 6 of the requests seem quite clearly excepted from public inspection as records "relating to job applicants."

But it is not so clear that *all* the records described in the requests are excepted. No doubt, *many* of the other records may be excepted, either as records "relating to job applicants," or to the extent that the records contain proprietary information of Kia or other private entities, as records "identifying proprietary hiring practices, training, skills, or other business methods and practices of a private entity." And perhaps *all* the other records may be so excepted. But as we understand the pleadings, they do not conclusively show that to be the case, and we must remember that this lawsuit is before us only upon motions to dismiss. We certainly can conceive, for instance, of records that could exist, that might be responsive to parts 7 and 8 of the requests, and that would not be excepted by OCGA § 50-18-72 (a) (47), even if some other exception might apply. Moreover, the parties have not fully briefed the extent to which particular parts of the requests seek *only* records that are excepted by paragraph 72 (a) (47), at least not in their briefs to this Court. Consequently, it seems most appropriate to leave it to the trial court on remand to sort out the

extent to which the specific parts of the requests seek only records that are excepted under paragraph 72 (a) (47) and to dismiss the lawsuit as to those parts of the requests.[23]

*Judgment reversed and case remanded. All the Justices concur.*

DECIDED NOVEMBER 18, 2013.

*Samuel S. Olens, Attorney General, Dennis R. Dunn, Deputy Attorney General, Russell D. Willard, Senior Assistant Attorney General, Nels S. D. Peterson, Solicitor-General, Fisher & Phillips, Claud L. McIver III,* for Deal et al.

*Constangy, Brooks & Smith, R. Carl Cannon,* for Kia Motors Manufacturing Georgia, Inc.

*Craig L. Goodmark, Gerald R. Weber, Jr.,* for Coleman et al.

*Robbins, Ross, Alloy, Belinfante & Littlefield, Joshua B. Belinfante, Kimberly L. Anderson, Stuckey & Manheimer, Hollie G. Manheimer,* amici curiae.

---

[23] When it undertakes to determine the extent to which the specific parts of the requests seek only records that are excepted by OCGA § 50-18-72 (a) (47), the trial court should bear in mind that this case is only at the pleadings stage. Accordingly, the lawsuit should be dismissed only to the extent that the requested records can be identified *through the pleadings* as records excepted by paragraph 72 (a) (47).