**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 19, 2023**

# In the Court of Appeals of Georgia

A23A1318. POOLE v. THE STATE.

DILLARD, Presiding Judge.

Following a trial by jury, Kaitlin Poole was convicted of theft by taking, and exploitation and intimidation of a disabled adult, elder person, or resident. She now appeals from these convictions and the denial of her motion for new trial, arguing that she is entitled to a new trial because two of those convictions are mutually exclusive. We affirm.

Viewed in the light most favorable to the jury's guilty verdict,[1] the record shows that in early 2020, Poole's father (the victim) was hospitalized due to COVID-19 and

---

[1] *See, e.g.*, *Powell v. State*, 335 Ga. App. 565, 566 (782 SE2d 468) (2016) ("Following a criminal conviction, we view the evidence in the light most favorable to the jury's verdict and no longer presume the defendant is innocent.").

placed into a medically induced coma in the ICU after flat-lining and requiring resuscitation. Upon being admitted to the hospital, Poole's father had a gray lunch bag with him containing his wallet, the keys to his truck and home, important documents, and around $41,000 in cash. And during his hospital stay, the victim was visited by Poole, Poole's mother, and Poole's girlfriend.[2]

While the victim was in a coma, his bag was given to Poole for safekeeping, and she brought it back with her to the home she shared with her girlfriend. But rather abruptly, Poole left town for several days and did not return her girlfriend's calls. This did not sit well with the girlfriend. She felt uncomfortable having the victim's bag in her home without Poole present, so she gave it to Poole's mother for safekeeping.

When Poole's mother received the bag and took it home with her, it still contained cash and the victim's wallet. But not long after, Poole texted her mother and asked "Why do you have my daddy's money? So everybody can take it[?]" Then, when the victim was transferred to a rehabilitation facility where Poole's mother worked, he asked her to place the bag in the facility's safe; but things went awry before she could do so.

---

[2] Of note, Poole had recently moved in with her girlfriend (who paid their household bills and whose vehicle they both used).

After her mysterious three-day disappearance, Poole returned home driving the victim's truck. She then asked her girlfriend to drive her to her mother's house, purportedly to retrieve clothes she purchased while away. Poole's mother left the backdoor unlocked for family (even when she was not at home), and when Poole emerged from the house, she was carrying a shopping bag and two shoe boxes. And not long after this, Poole's girlfriend noticed the gray lunch bag was back in the home they shared.

Around this same time, Poole's mother looked for the bag in *her* home but could not find it. She knew what had happened and informed the victim that Poole had taken the bag before it could be placed in the rehabilitation facility's safe. The victim then attempted to speak with his daughter about the bag, but she refused to discuss the matter. The victim then explained that he needed his wallet and documents to verify his identification, at which point Poole returned her father's wallet.

The victim remained in care facilities for the next several months, and during that time Poole dressed in new athletic wear and sneakers; purchased a motorcycle, refrigerator, and various tools; got a large tattoo; and paid for repairs to her girlfriend's vehicle. Additionally, Poole's girlfriend changed the locks at the victim's

apartment after Poole said he requested that they do so. Finally, Poole used the victim's truck to run errands and haul motorcycles, and she refused to return the truck when he asked her to do so.

When the victim finally returned home, he found the locks to his apartment changed and had to contact the property owner to regain access. Once inside, he found that his cash, iPad, watch, guns, knives, and paperwork were all missing. And believing his daughter and her girlfriend were involved, he asked Poole to return his property; but she only returned his weapons and paperwork.

After Poole repeatedly refused to return his belongings, the victim contacted law enforcement to report the missing items (including his truck and cash), and relayed his suspicions that Poole was in possession of them. The truck was located at Poole's home and towed back to the victim's residence at his request, but the $41,000 in cash was never recovered.[3] Poole was subsequently charged with and convicted of the offenses noted above. This appeal follows.

---

[3] The victim was "not well physically . . . and still pretty sick" when he met with law enforcement. As a result of losing his money, he was destitute. He could no longer pay for a place to live, continue in-home care, repair the damage to his truck that Poole caused while driving it, and was now unable to cover his own funeral expenses.

Poole's sole enumeration of error is that her convictions for theft by taking and exploitation and intimidation of a disabled adult, elder person, or resident, are mutually exclusive. We disagree.

The term "mutually exclusive" generally applies to two guilty verdicts that "cannot legally exist simultaneously,"[4] and in such cases, when "it is both legally and logically impossible to convict on both counts, a new trial should be ordered."[5] So, when verdicts are mutually exclusive, a guilty verdict on "one count logically excludes a finding of guilt on the other."[6] Indeed, when convictions are mutually exclusive, it is insufficient to merely set aside the lesser verdict, because to do so is to "speculate about what the jury might have done if properly instructed, and to usurp the functions

---

[4] *Middleton v. State*, 309 Ga. 337, 339 (2) (846 SE2d 73) (2020) (punctuation omitted); *accord Rutland v. State*, 315 Ga. 521, 523 (1) (883 SE2d 730) (2023); *McElrath v. State*, 308 Ga. 104, 110 (2) (b) (839 SE2d 573) (2020).

[5] *Middleton*, 309 Ga. at 339 (2) (punctuation omitted); *accord McElrath*, 308 Ga. at 110 (2) (b).

[6] *Jackson v. State*, 276 Ga. 408, 410 (2) (577 SE2d 570) (2003) (punctuation omitted), *overruled on other grounds by State v. Springer*, 297 Ga. 376 (774 SE2d 106) (2015); *accord Nalls v. State*, 304 Ga. 168, 174 (3) (815 SE2d 38) (2018); *Tepanca v. State*, 297 Ga. 47, 49 (3) (771 SE2d 879) (2015).

of both the jury and trial court."[7] Accordingly, judgments entered upon such verdicts

are void.[8]

Turning now to the offenses at issue, we begin by looking to the statutory

language for each. And in doing so, we necessarily begin our analysis with "familiar

and binding canons of construction."[9] Suffice it to say, in considering the meaning of

a statute, our charge is to "presume that the General Assembly meant what it said and

said what it meant."[10] Toward that end, we must afford the statutory text its plain and

---

[7] *Middleton*, 309 Ga. at 339 (2) (punctuation omitted); *accord McElrath*, 308 Ga. at 110 (2) (b) (2020); *Dumas v. State*, 266 Ga. 797, 799 (1) (471 SE2d 508) (1996).

[8] *Middleton*, 309 Ga. at 339 (2). Because such judgments are void, "they may be subsequently challenged even when an objection on that basis was not made at trial," as is the case here. *Id.* (punctuation omitted); *see Philmore v. State*, 300 Ga. 558, 558 (796 SE2d 652) (2017) ("Although this issue . . . was raised by Appellant for the first time on appeal, it is preserved for our review as Georgia law recognizes that a sentence which is not allowed by law is void and its illegality may not be waived." (punctuation omitted)).

[9] *Monumedia II, LLC v. Dep't of Transp.*, 343 Ga. App. 49, 51 (1) (806 SE2d 215) (2017) (punctuation omitted); *accord Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[10] *Monumedia II, LLC*, 343 Ga. App. at 51-52 (1) (punctuation omitted); *accord Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013); *Holcomb*, 329 Ga. App. at 517 (1); *Martinez v. State*, 325 Ga. App. 267, 273 (2) (750 SE2d 504) (2013).

ordinary meaning,[11] consider the text contextually,[12] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[13] and seek to "avoid a construction that makes some language mere surplusage."[14] Simply put,

---

[11] *Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see Tibbles v. Teachers Retirement Sys. of Ga.*, 297 Ga. 557, 558 (1) (775 SE2d 527 (2015) ("A statute draws its meaning, of course, from its text." (punctuation and citation omitted)); *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015) (same); *State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . ."); *Singletary v. State*, 310 Ga. App. 570, 572 (713 SE2d 698) (2011) ("In construing these statutes, we apply the fundamental rules of statutory construction that require us to construe the statutes according to their terms, [and] to give words their plain and ordinary meaning . . . ." (punctuation omitted)).

[12] *Monumedia II, LLC*, 343 Ga. App. at 52 (1); *see Arizona v. Inter Tribal Council of Arizona, Inc.*, 1 U.S. 10 (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *see also Tibbles*, 297 Ga. at 558 (1) ("The common and customary usages of the words are important, but so is their context." (punctuation and citation omitted)).

[13] *Monumedia II, LLC*, 343 Ga. App. at 52 (1) (punctuation omitted); *accord Deal*, 294 Ga. at 172-73 (1) (a); *Holcomb*, 329 Ga. App. at 518 (1).

[14] *Monumedia II, LLC*, 343 Ga. App. at 52 (1) (punctuation omitted); *accord In the Interest of L.T.*, 325 Ga. App. at 592; *Holcomb*, 329 Ga. App. at 518 (1).

7

when the language of a statute is "plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly."[15]

Our initial focus, then, is on the statutory language used to describe the offenses of theft by taking and exploitation and intimidation of a disabled adult. Looking first to theft by taking, a person commits this offense when she "unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated."[16] And in this case, Poole was indicted for theft by taking in that she, "being in lawful possession of cash and money and a Silver Ford F-150 truck, the property of [the victim], with a value of twenty-five thousand dollars ($25,000.00) and more, did unlawfully appropriate said property with the intention of depriving said owner of said property[.]" She was also charged with exploitation and intimidation of a disabled adult, under OCGA § 16-5-102 (a), which provides that

---

[15] *Monumedia II, LLC*, 343 Ga. App. at 52 (1) (punctuation omitted); *accord Holcomb*, 329 Ga. App. at 518 (1); *Luangkhot v. State*, 292 Ga. 423, 424 (1) (736 SE2d 397 (2013), *superseded by statute on other grounds as recognized by Estrada-Nava v. State*, 332 Ga. App. 133 (771 SE2d 28) (2015); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

[16] OCGA § 16-8-2.

"[a]ny person who knowingly and willfully exploits a disabled adult, elder person, or resident . . . shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for not less than one nor more than 20 years, a fine of not more than $50,000.00, or both." Specifically, Poole was indicted under this statute because she

> did knowingly and willfully exploit the resources of [the victim], a disabled adult, by means of deception, false pretense, false representation and other similar means, for the benefit of another, to wit: the accused did acquire money and a vehicle belonging to [the victim] while said person was medically incapacitated due to COVID 19, in a hospital and a care facility, and did use said money and vehicle for her own benefit rather than the benefit of the victim[.]

Nevertheless, Poole argues that her convictions for these offenses are mutually exclusive because she was alleged to be "in lawful possession" of her father's property for purposes of theft by taking while, at the same time, exploiting him through deception. This argument is a nonstarter.

As Poole correctly notes, for purposes of OCGA § 16-5-102 (a), "exploit" is defined as "illegally or improperly using a disabled adult or elder person or that person's resources through undue influence, coercion, harassment, duress, deception, false representation, false pretense, abuse of access, or other similar means for one's

9

own or another person's profit or advantage."[17] And looking to this definition and the statutory language used to describe the offense of exploitation of a disabled adult,[18] there is no requirement that Poole have been in possession of her father's property *unlawfully* to commit the offense. Indeed, as the foregoing facts demonstrate, Poole *improperly used* (*i.e.*, exploited) her father's resources for her own benefit under the false pretense that she was protecting his property—*i.e.*, while she was ostensibly in lawful possession of the property.[19] Moreover, as previously explained, a person can

---

[17] OCGA § 16-5-100 (6).

[18] *See* OCGA § 16-5-102 (a) (providing that "[a]ny person who knowingly and willfully exploits a disabled adult, elder person, or resident, willfully inflicts physical pain, physical injury, sexual abuse, mental anguish, or unreasonable confinement upon a disabled adult, elder person, or resident, or willfully deprives of essential services a disabled adult, elder person, or resident shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for not less than one nor more than 20 years, a fine of not more than $50,000.00, or both").

[19] *See Anderson v. State*, 350 Ga. App. 369, 372-74 (1) (829 SE2d 453) (2019) (affirming convictions for theft by taking and exploitation of an elderly person when evidence showed victim's daughter (1) improperly used access to the victim's bank account to spend funds for defendant's personal benefit and (2) unlawfully appropriated funds while in lawful possession of money from the same bank account); *Escamilla v. State*, 344 Ga. App. 654, 655-56 (1) (811 SE2d 77) (2018) (holding that evidence defendant assisted victim and deceived her into transferring large sum of money from victim's account to defendant's account supported defendant's conviction for exploitation of an elder person); *see also Bradford v. State*, 266 Ga. App. 198, 201-02 (2) (596 SE2d 715) (2004) (noting that the State may indict someone for

commit theft by taking when she, "being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated."[20] So, the convictions at issue are not mutually exclusive and are instead legally and logically capable of existing simultaneously.[21]

---

theft by taking, but prove theft by deception, which is committed when a person obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property).

[20] OCGA § 16-8-2.

[21] *See Bell v. State*, 347 Ga. App. 231, 232 (2) (818 SE2d 688) (2018) (holding that convictions were not mutually exclusive when it was "not logically or legally impossible to convict [the defendant] of stealing the cell phones and receiving the stolen car" because the convictions involved different property); *cf. Middleton*, 309 Ga. at 346 (3) ("Because a conviction for theft by receiving—whether by receiving, disposing of, or retaining stolen property—necessarily entails a finding that the defendant was not the principal thief, such a conviction is legally and logically incompatible with a conviction on the same facts for another offense that requires the defendant to be the principal thief who took or obtained the same property from the victim of the theft."); *Thomas v. State*, 261 Ga. 854, 855 (1) (413 SE2d 196) (1992) (holding that convictions for robbery of a vehicle and theft by receiving were mutually exclusive because "[t]he offense of theft by receiving is intended to catch the person who buys or receives stolen goods, as distinct from the principal thief" and "[a]n essential element of the crime of theft by receiving is, that the goods had been stolen by some person other than the accused" (punctuation omitted)); *Frazier v. State*, 339 Ga. App. 405, 408 (1) (a) (793 SE2d 580) (2016) (holding that convictions for hijacking a car and theft by receiving the same stolen property were mutually exclusive because the defendant "could not be convicted of both taking and receiving the stolen

11

For all these reasons, we affirm.

*Judgment affirmed. Rickman and Pipkin, JJ., concur.*

---

property because one cannot receive stolen property unless it is first taken by someone else"); *Ingram v. State*, 268 Ga. App. 149, 151-52 (5) (601 SE2d 736) (2004) (holding that convictions for theft by taking and theft by receiving were mutually exclusive when theft by receiving applies to one other than the principal thief).