FINAL COPY
295 Ga. 388

S14A0309. MAY v. THE STATE.

BLACKWELL, Justice.

This case concerns the meaning of OCGA § 19-7-5, which requires school teachers[1] and certain other persons,[2] if they have "reasonable cause to believe

---

[1] The statute does not define "school teachers," but it broadly defines a "school" as "any public or private pre-kindergarten, elementary school, secondary school, technical school, vocational school, college, university, or institution of postsecondary education." OCGA § 19-7-5 (b) (9).

[2] These other persons are identified in OCGA § 19-7-5 (c) (1) (A)-(O):

(A) Physicians licensed to practice medicine, physician assistants, interns, or residents;

(B) Hospital or medical personnel;

(C) Dentists;

(D) Licensed psychologists and persons participating in internships to obtain licensing pursuant to Chapter 39 of Title 43;

(E) Podiatrists;

(F) Registered professional nurses or licensed practical nurses licensed pursuant to Chapter 26 of Title 43 or nurse's aides;

(G) Professional counselors, social workers, or marriage and family therapists licensed pursuant to Chapter 10A of Title 43;

(H) School teachers;

(I) School administrators;

(J) School guidance counselors, visiting teachers, school social workers, or school psychologists certified pursuant to Chapter 2 of Title 20;

(K) Child welfare agency personnel, as that agency is defined pursuant to Code Section 49-5-12;

(L) Child-counseling personnel;

(M) Child service organization personnel;

(N) Law enforcement personnel; [and]

(O) Reproductive health care facility or pregnancy resource center

that a child has been abused," to make a report of such abuse. OCGA § 19-7-5 (c) (1) (H). The statute defines "child abuse" to include "[s]exual abuse of a child,"[3] OCGA § 19-7-5 (b) (4) (C), and it defines "sexual abuse" to include nine specified varieties of sexual activity involving a child.[4] OCGA § 19-7-5 (b) (10) (A)-(I). The statute makes it a crime for a person required to make such a report to "knowingly and willfully fail[ ] to do so." OCGA § 19-7-5 (h).

According to the record, Kristin Lynn May was employed as a teacher at River Ridge High School, a public secondary school in the Cherokee County School District. In January 2011, May spoke with a former student — P. M., then sixteen years of age — who no longer was enrolled as a student at River Ridge, and who recently had transferred to a school in the Fulton County School

---

personnel and volunteers.

[3] For the purposes of the statute, "child abuse" also includes "[p]hysical injury or death inflicted upon a child by a parent or caretaker thereof by other than accidental means," OCGA § 19-7-5 (b) (4) (A), "[n]eglect or exploitation of a child by a parent or caretaker thereof," OCGA § 19-7-5 (b) (4) (B), and "[s]exual exploitation of a child." OCGA § 19-7-5 (b) (4) (D).

[4] The statute excepts sexual activities between a minor and the spouse of the minor, as well as "consensual sex acts involving persons of the opposite sex when the sex acts are between minors or between a minor and an adult who is not more than five years older than the minor." OCGA § 19-7-5 (b) (10). We note, however, that it does not except — and, therefore, appears to require the reporting of — other consensual activities in which a minor of the legal age of consent lawfully may engage.

District. As they spoke, P. M. disclosed that she previously had a sexual relationship with Robert Leslie Morrow, a paraprofessional at River Ridge. No one appears to dispute that this relationship involved sexual activities that are defined in OCGA § 19-7-5 (b) (10) as "sexual abuse." May, however, did not make any report of the sexual abuse.

When these circumstances later came to the attention of law enforcement, May was charged by accusation with a criminal violation of OCGA § 19-7-5. In pertinent part, the accusation[5] alleged that May:

> [I]n Cherokee County, Georgia, in January 2011, did unlawfully then and there commit the offense of FAILURE TO REPORT CHILD ABUSE, by being a school teacher, a mandatory reporter within the meaning and purview of [OCGA § 19-7-5 (c) (1)], and knowingly and willfully failing to report a case of suspected child abuse, to wit, sexual abuse, against a student, [P. M.] . . . .

In response to the accusation, May filed a demurrer and plea in bar, contending that the accusation charged no crime as a matter of law. When the trial court heard argument on the demurrer and plea in bar, the State and May stipulated to certain facts in addition to those alleged explicitly in the accusation, including

---

[5] The State has filed three accusations in this case. For the purposes of this appeal, the relevant accusation is the last of these accusations. The allegations recited herein are taken from the last accusation.

that P. M. — by the time she spoke with May in January 2011 and disclosed her sexual relationship with Morrow — no longer was a student at River Ridge. Because P. M. was not then enrolled at River Ridge, May argued, she had no duty under OCGA § 19-7-5 (c) (1) to make a report.

The trial court denied the demurrer and plea in bar, reasoning that a school teacher is required to report the abuse of any child, even one with whom the teacher has no relationship at all. According to the trial court, to prove a violation of OCGA § 19-7-5 in this case, the State would only be required to prove:

> (1) that [May] was a teacher, (2) that [May] knew or suspected one or more instances of child abuse as defined in OCGA § 19-7-5, (3) that [May] failed to report the abuse, and (4) that the crime occurred in Cherokee County.

In the alternative, the trial court reasoned that, even if a relationship with the child were required, proof that May had taught P. M. in the past would be enough to establish such a relationship. The trial court certified its denial of the demurrer and plea in bar for immediate review, and May filed an application with the Court of Appeals for leave to take an interlocutory appeal.[6] The Court

---

[6] See generally OCGA § 5-6-34 (b).

of Appeals denied that application in an unreported order, and May then filed a petition for a writ of certiorari in this Court. We granted the petition to consider whether the obligation to report abuse under OCGA § 19-7-5 (c) (1) extends to all children or instead is limited to children to whom the reporter has a duty to attend.[7] For the reasons that follow, we conclude that the obligation is limited, and school teachers and other reporters only have an obligation to report the abuse of children to whom they attend in connection with the profession, occupation, employment, or volunteer work by which they are identified in subparagraphs (c) (1) (A)-(O) as a mandatory reporter.

Our inquiry into the scope of the obligation under OCGA § 19-7-5 (c) (1) begins, of course, with the words of that provision. Paragraph (c) (1) says that mandatory reporters "having reasonable cause to believe that a child has been abused shall report or cause reports of that abuse to be made as provided in this Code section." If we stopped there, it would be easy enough to conclude — just

_____

[7] When we granted the petition for a writ of certiorari, we specifically directed the parties to address this issue in their briefs. We also asked the parties to address another issue, whether the willfulness element of OCGA § 19-7-5 (h) requires proof that the accused acted with an evil purpose or with knowledge of her legal duty to report. Because our resolution of the first issue is sufficient to dispose of this appeal, however, we decide nothing about the willfulness element. We leave willfulness for another day.

as the trial court in this case did — that the obligation of a mandatory reporter extends to any child of whom the reporter learns of abuse. After all, looking only to the words of paragraph (c) (1), the statutory reference to "a child" would seem to refer to any child at all, even a child not connected in any way with the reporter. But it would be a mistake to end our analysis without first considering the full context of those words.

As we have explained before, "[w]hen we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant." Deal v. Coleman, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (citation and punctuation omitted). To this end, "we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would." Id. (citations and punctuation omitted). In our search for the meaning of a particular statutory provision, we look not only to the words of that provision, but we consider its legal context as well. See Smith v. Ellis, 291 Ga. 566, 573 (3) (a) (731 SE2d 731) (2012) ("In construing statutes, however, we do not read words in isolation, but rather in context."). See also Brown v. State, 290 Ga. 865, 868 (2) (b) (725 SE2d 320) (2012) ("[W]ords often gain meaning from context . . . ."). After all, "[c]ontext is a primary

6

determinant of meaning." Scalia & Garner, Reading Law: The Interpretation of Legal Texts 167 (West 2012). For context, we may look to other provisions of the same statute, see Hendry v. Hendry, 292 Ga. 1, 3 (1) (734 SE2d 46) (2012), the structure and history of the whole statute, see Deal, 294 Ga. at 184 (2) (b), and the other law — constitutional, statutory, and common law alike — that forms the legal background of the statutory provision in question. See Peachtree-Cain Co. v. McBee, 254 Ga. 91, 93 (1) (327 SE2d 188) (1985).

With these principles in mind, we turn now to the context of OCGA § 19-7-5 (c) (1), and we start with the other provisions and structure of the statute. Although paragraph (c) (1) identifies the persons required to make a report, other provisions of the statute direct the manner in which a report must be made. In general, a reporter must report directly "to a child welfare agency providing protective services . . . or, in the absence of such agency, to an appropriate police authority or district attorney." OCGA § 19-7-5 (e). There is, however, a different reporting procedure for reporters in an institutional facility, and in paragraph (c) (2), which provides for this alternative procedure, we find a significant clue about the extent of the obligation under paragraph (c) (1) to make a report:

7

*If a person is required to report child abuse pursuant to this subsection because that person attends to a child pursuant to such person's duties as an employee of or volunteer at a hospital, school, social agency, or similar facility*, that person shall notify the person in charge of the facility, or the designated delegate thereof, and the person so notified shall report or cause a report to be made in accordance with this Code section. An employee or volunteer who makes a report to the person designated pursuant to this paragraph shall be deemed to have fully complied with this subsection. . . .

OCGA § 19-7-5 (c) (2) (emphasis supplied). Paragraph (c) (2) speaks of an employee or volunteer of an institutional facility having an obligation to make a report about the abuse of a child *because* she attends to that child at the facility. If paragraph (c) (2) means exactly what it says — that attending to a child is the circumstance that *causes* the obligation to arise — then the obligation necessarily must be limited to children to whom a mandatory reporter attends.[8] We think that paragraph (c) (2) is most reasonably understood to presuppose just such a limitation.

To be sure, we must consider whether the statutory reference to a causal link between attending to a child and the obligation to make a report reasonably

---

[8] Such a limitation would be, of course, consistent with the identification of mandatory reporters in OCGA § 19-7-5 (c) (1) (A)-(O), all of whom are identified by reference to a profession, an occupation, employment, or volunteer work in the course of which one reasonably might be expected to attend to children.

8

might be read in another way, one that does not presuppose that the obligation is limited in all cases to children to whom the reporter attends. According to OCGA § 19-7-5 (c) (1), the obligation arises only when a mandatory reporter "ha[s] reasonable cause to believe that a child has been abused," and attending to a child is perhaps the most common way in which a mandatory reporter might come to have cause for such a belief. If paragraph (c) (2) is meant only to reflect this rather obvious fact, then its first sentence plausibly could be read as follows:

> If a person is required to report child abuse pursuant to this subsection because that person [came to have reasonable cause to believe that a child has been abused as a result of] attend[ing] to a child pursuant to such person's duties as an employee of or volunteer at a hospital, school, social agency, or similar facility, that person shall notify the person in charge of the facility, or the designated delegate thereof, and the person so notified shall report or cause a report to be made in accordance with this Code section.

Such a reading, however, would mean that the alternative reporting procedure described in paragraph (c) (2) is not the sole reporting procedure for persons who are mandatory reporters by virtue of their employment or volunteer work at institutional facilities, some of whom might have "reasonable cause to believe that a child has been abused" — even a child entrusted to the care and protection

9

of others at the same institution — in the absence of any duty to personally attend to the child.[9]

The alternative reporting procedure appears to serve a number of important purposes, none of which would be well served if it were not routinely available to employees and volunteers at an institutional facility. In the setting of such a facility, the alternative procedure relieves employees and volunteers of the burden of identifying the appropriate child welfare or law enforcement agency to whom a report must be made, and it puts that burden instead on "the person in charge of the facility, or the designated delegate thereof." By doing so, the alternative procedure makes prompt reporting more likely, and it makes reports more likely to be directed to the appropriate agency. Doubt among the employees and volunteers of a facility about the proper procedure by which a

---

[9] Consider "hospital personnel," who are identified in OCGA § 19-7-5 (c) (1) (B) as mandatory reporters. Many "hospital personnel" — nurses, orderlies, and the like — are assigned duties that include attending to patients. But other "hospital personnel" — workers in a hospital cafeteria, janitors, and maintenance staff, for instance — do not ordinarily attend to patients. The latter sort of "hospital personnel" do, however, regularly work around patients and the families of patients, and in the course of that work, it is hardly implausible to think that they might come to have "reasonable cause to believe that a child [being treated as a patient of the hospital] has been abused." If such personnel might have an obligation to report the abuse, notwithstanding that they do not attend to the child abused, then they would not fall under the guidelines of paragraph (c) (2) and would be required to make a report directly to the appropriate child welfare or law enforcement agency.

10

report is to be made undoubtedly would tend to slow the making of reports and sometimes result in their misdirection. The alternative procedure also serves to improve the quality of the reporting. In an institutional facility, management may know far more about the condition of a child than any one employee or volunteer, and by channeling a report through management, the opportunity exists for management to supplement the report of an employee or volunteer with additional pertinent information, something that the statute itself contemplates explicitly. See OCGA § 19-7-5 (c) (2) (although "the person in charge of the facility, or the designated delegate thereof," may not suppress or alter "the information provided by the reporter," such person "may provide any additional, relevant, and necessary information when making the report"). Moreover, when more than one reporter has contact with a child and learns of abuse — something that seems likely in an institutional facility — the channeling of a report through management reduces the likelihood of redundant reports, perhaps to different agencies or different points of contact within the same agency. The alternative procedure thereby also serves to reduce the administrative burden on the agencies to whom reports must be made. Finally, by directing employees and volunteers to share their worries about child abuse

11

with management, the alternative procedure ensures that the institutional facility itself — which may be able to act more quickly to protect a child in its care and protection than a child welfare or law enforcement agency — is aware of the abuse. The purposes served by the statutory alternative reporting procedure suggest strongly that it was meant to be the sole reporting procedure for employees and volunteers at institutional facilities. Consequently, paragraph (c) (2) is most reasonably understood, we think, to presuppose that the obligation to make a report is limited to children to whom the reporter attends.

The statutory history of OCGA § 19-7-5 also suggests that the obligation is most reasonably understood in this way. When the first version of the statute was enacted in 1965, such a limitation was explicit:

> Any physician[,] licensed osteopathic physician, intern, resident, public health nurse or welfare worker having cause to believe that a child under the age of twelve *brought to him or coming before him for examination, care or treatment* has had physical injury or injuries inflicted upon him other than by accidental means by a parent or caretaker, shall report or cause reports to be made in accordance with the provisions of this section; provided, however, that when the attendance of a physician with respect to a child is pursuant to the performance of services as a member of the staff of a hospital or similar institution[,] he shall notify the person in charge of the institution or his designated delegate[,] who shall report or cause reports to be made in accordance with the provisions of this section; and provided,

12

further, that when an apparently abused child has been seen by a public health nurse or welfare worker, then said public health nurse or welfare worker shall report his or her observation to the county health officer or, if none, to any licensed physician who shall, after examination and if he concurs that the injuries were inflicted by other than accidental means, report or cause reports to be made in accordance with the provisions of this section.

Ga. L. 1965, p. 588, § 1 (emphasis supplied). Three years later, the statute was amended to add dentists and podiatrists as mandatory reporters, Ga. L. 1968, p. 1196, § 1, and it was amended again in 1973 to extend its provisions to "employee[s] of a local public school system or the State Department of Education, county or municipal recreation personnel, [and] other person[s] charged with the responsibility for the health, welfare, or education of a child." Ga. L. 1973, p. 309, § 1. Still, the statute retained the explicit limitation to children "brought to [a mandatory reporter] or coming before him for examination, care or treatment." Id.

The next year, the statute was substantially rewritten, and the explicit limitation was omitted from the revised version of the statute. See Ga. L. 1974, p. 438, § 1. From that omission, one reasonably might conclude that the General Assembly meant to lift the limitation, but for another provision of the 1974 version of the statute that presupposed — in much the same way as the modern

13

version of OCGA § 19-7-5 (c) (2), but even more clearly — that the obligation

still was limited to children to whom the mandatory reporter attends:

> Any physician[,] licensed osteopathic physician, intern, resident, dentist, podiatrist, public health nurse, social worker, teacher, school administrator, child care personnel or law enforcement personnel having cause to believe that a child under the age of eighteen has had physical injury or injuries inflicted upon him other than by accidental means by a parent or caretaker, or has been neglected or exploited by a parent or caretaker, or has been sexually assaulted, shall report or cause reports to be made in accordance with the provisions of this section; provided, however, that *when the attendance of the reporting person with respect to a child* is pursuant to the performance of services as a member of the staff of a hospital, school, social agency or similar facility, he shall notify the person in charge fo the facility or his designated delegate[,] who shall report or cause reports to be made in accordance with the provisions of this section.

Id. (emphasis supplied). The statute was amended again in 1977 to add

psychologists and day care workers as mandatory reporters, see Ga. L. 1977, p.

242, § 1, in 1978 to clarify the agency to whom a report must be made, see Ga.

L. 1978, p. 2059, § 1, and in 1980 to specify that a mandatory reporter lawfully

may photograph the injuries of an abused child without the consent of his

parents. See Ga. L. 1980, p. 921, § 1. In 1981, the statute was amended yet again

to add "hospital or medical personnel," "nursing personnel," "social work

personnel," and "school guidance counselors" as mandatory reporters and to add

14

neglect, exploitation, and sexual exploitation to the categories of abuse requiring a report, among other changes. See Ga. L. 1981, p. 1034, § 1. Seven years later, more classes of persons were identified as mandatory reporters. See Ga. L. 1988, p. 1624, § 1. Still, the statute retained the structure and clear presupposition of the 1974 amendment.

The statute was revised again in 1990, and as a result of that revision, the statute was set out in a structure that persists to this day. See Ga. L. 1990, p. 1761, § 1. In each of the earlier versions of the statute, the provision identifying the classes of mandatory reporters and the provision about the report of a child to whom the reporter attends in an institutional facility had appeared together in a single sentence. See, e.g., Ga. L. 1974, p. 438, § 1. In 1990, for the first time, these provisions were separated into distinct paragraphs, just as they are separated today. To cleanly separate provisions that previously had appeared together in a single sentence, it was necessary, of course, to rewrite the beginning of the latter provision. Accordingly, the latter provision was rewritten in its modern form:

> If a person is required to report abuse pursuant to this subsection because that person attends to a child pursuant to such person's duties as a member of the staff of a hospital, school, social

agency, or similar facility, that person shall notify the person in charge of the facility, or the designated delegate thereof, and the person so notified shall report or cause a report to be made in accordance with this Code section.

Ga. L. 1990, p. 1761, § 1.[10]

Although this rewritten provision does not signal quite as clearly as earlier versions of the statute that the obligation to report is limited to children to whom the reporter attends, it nevertheless is, as we have explained, reasonably susceptible of such an understanding. Nothing else in the 1990 legislation — including its preamble — suggests in any way that the General Assembly then intended to alter the limitation that had been a part of the statute since its original enactment in 1965. See id. Although commentary on the 1990 amendment notes a number of significant changes worked by the amendment, the commentary suggests no contemporary understanding that the amendment changed the scope of the obligation in so fundamental a way. See Miller, "Comprehensive Child Abuse Legislation," 7 Ga. St. U. L. Rev. 268, 272-275 (Fall 1990). And in any event, if the General Assembly had intended in 1990 to

---

[10] In 2012, "as a member of the staff of" was changed to "as an employee of or volunteer at." Ga. L. 2012, p. 928, § 5-1. This change coincided with revisions of the statutory definitions and identifications of mandatory reporters, which resulted for the first time in certain volunteers being identified explicitly as mandatory reporters.

16

abandon the presupposed limitation of the obligation — and thereby to substantially expand the scope of the obligation — surely it would have done so by a revision of paragraph (c) (1), rather than by rewriting paragraph (c) (2) so as to make less clear, but not eliminate, the text that implies such a limitation.

We note as well that understanding the statutory obligation to report as one limited to children to whom the reporter attends fits comfortably with settled principles of the common law. The General Assembly properly can, of course, enact legislation that departs from the common law, but to the extent that statutory text can be as reasonably understood to conform to the common law as to depart from it, the courts usually presume that the legislature meant to adhere to the common law. See Eason Publications v. Atlanta Gazette, Inc., 141 Ga. App. 321, 324 (233 SE2d 232) (1977) ("Where there is limitation by a statute which is capable of more than one construction, the statute must be given that construction which is consistent with the common law." (Citation and punctuation omitted)). See also Scalia & Garner, supra at 318 ("The better view is that statutes will not be interpreted as changing the common law unless they effect the change with clarity."). As a general rule at common law, "strangers . . . are under no obligation to keep watch and ward over the children of others."

17

Macon, Dublin & Savannah R. Co. v. Jordan, 34 Ga. App. 350, 353 (129 SE 443) (1925) (citation omitted). A person, however, who stands in loco parentis or otherwise undertakes to attend to a child may owe a duty at common law to exercise reasonable care for the protection of the child. See Doe v. Andujar, 297 Ga. App. 696, 697-698 (1) (678 SE2d 163) (2009) ("A person who undertakes to supervise a child, whether or not for compensation, has a duty to use reasonable care to protect the child from injury."). See also Persinger v. Step by Step Infant Dev. Center, 253 Ga. App. 768, 769 (560 SE2d 333) (2002) (duty of daycare center); Wallace v. Boys Club of Albany, Ga., 211 Ga. App. 534, 535 (1) (439 SE2d 746) (1994) (duty of summer camp). Likewise, as a general rule at common law, one owes no duty to protect another from injuries inflicted by a third party. See Walton v. UCC X, Inc., 282 Ga. App. 847, 848-849 (1) (640 SE2d 325) (2006). The general rule, however, does not always apply when one has undertaken a special relationship with the person exposed to such injury. See, e.g., City of Rome v. Jordan, 263 Ga. 26, 28 (1) (426 SE2d 861) (1993) (duty of municipality to provide police protection). Insofar as the purpose of OCGA § 19-7-5 is to protect abused children from further abuse, see OCGA § 19-7-5 (a), understanding the obligation to report as one limited to children to

18

whom the mandatory reporter attends is consistent with the general approach of the common law.

In this Court, the State concedes that the obligation to report is limited and that the reference in OCGA § 19-7-5 (c) (1) to "a child" does not mean literally "any child." But unlike May, the State fails to point to a meaningful limitation that is grounded in the text, structure, history, and the law in the background of the statute. Considering the words of paragraph (c) (1) and their legal context, the statutory obligation to report the abuse of a child is most reasonably understood as one limited to the abuse of a child to whom the mandatory reporter "attends . . . pursuant to [her] duties" in the profession, occupation, employment, or volunteer work by which she is identified in subparagraphs (c) (1) (A)-(O) as a mandatory reporter. That is the meaning that we attribute to the statute.[11]

---

[11] We do not rely in this case upon the rule of lenity, see Haley v. State, 289 Ga. 515, 527 (2) (b) (712 SE2d 838) (2011), but we note that if it were applied here, it would lead us to the same conclusion. We also do not rely in this case upon the canon of constitutional doubt, see id. at 521-522 (2) (b), notwithstanding that OCGA § 19-7-5 may invite, as we have said before, "serious constitutional inquiry." Gladson v. State, 258 Ga. 885, 886 (4) (376 SE2d 362) (1989). Our understanding that the statutory obligation to report is limited to children to whom the mandatory reporter attends may relieve some doubts about the constitutionality of the statute, but we do not undertake to resolve any constitutional questions today.

19

Having identified the extent of the statutory obligation, we turn now to the facts of this case, as alleged in the accusation or stipulated below. By the time May learned of the sexual abuse, P. M. no longer was her student, no longer was enrolled in the school at which May taught, and no longer was enrolled at any school in the same school system. In these circumstances, we cannot conceive any set of facts by which the State might prove that May — when she learned of the sexual abuse — was attending to P. M. pursuant to her duties as a school teacher at River Ridge.[12] Accordingly, May had no legal obligation to report the sexual abuse,[13] and the trial court erred when it sustained the accusation.

Judgment reversed. All the Justices concur.

---

[12] In some cases, whether a school teacher attends to a child pursuant to her duties as a teacher may present a question of fact, such as, for instance, when the child is not assigned to the class of the teacher, but the child is enrolled as a student at the same school. This, however, is no such case.

[13] That May was not legally obligated to report the abuse does not mean, of course, that she was not morally obligated to do so. See McGarrah v. Posig, 280 Ga. App. 808, 810 (635 SE2d 219) (2006).

Decided June 30, 2014.

Certiorari to the Court of Appeals of Georgia.

Cauthorn, Nohr & Owen, Thonas E. Cauthorn III, James W. Cauthorn, Bettina S. Davies, for appellant.

Jessica K. Moss, Solicitor-General, Barry W. Hixson, Assistant Solicitor-General, for appellee.