**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 5, 2019**

# In the Court of Appeals of Georgia

A18A1701. CATOOSA COUNTY, GEORGIA, et al. v. ROME NEWS MEDIA d/b/a CATOOSA COUNTY NEWS.

DILLARD, Chief Judge.

Catoosa County, Georgia, and three county officials acting in their official capacities[1] (collectively, "Catoosa County" or the "County") appeal the trial court's grant of declaratory and injunctive relief to Rome News Media, LLC, d/b/a Catoosa County News ("CCN"), which sued the County to enjoin it from changing the official legal organ of the County from CCN to the Chattanooga Times Free Press ("Chattanooga Times"). According to CCN, taking such an action would violate OCGA § 9-13-142 *et al.*, which sets forth the eligibility requirements a newspaper

---

[1] The three individual appellants are Gary Sisk, in his capacity as Sheriff of Catoosa County; Jeffrey Hullender, in his capacity as probate judge of Catoosa County; and Tracy Brown, in her capacity as clerk of the Superior Court of Catoosa County.

must satisfy to be designated as the official legal organ of a Georgia county. For the reasons set forth *infra*, we affirm.

Rome News Media—a publishing company located outside of Catoosa County in Rome, Georgia—publishes several newspapers, including CCN, which is a weekly newspaper that has been the official legal organ for Catoosa County since its creation in 1949. And since 1992, CCN has been physically located within Catoosa County in Ringgold, Georgia, where it has several employees, including a full-time editor and advertising sales representative, as well as two part-time reporters and a part-time sports editor. The editor of CCN is responsible for "operating the news side of the newspaper[,]" and once he determines the content and design of each paper, he then sends it to Rome for processing and printing. But the decision-making for what stories are to be written and by whom, and the layout of the stories in the paper, occurs in Ringgold. In addition, the commercial advertisements for the newspaper are solicited from CCN's Ringgold office. The legal notices, on the other hand, are not solicited because they are required by statute. Specifically, these legal notices include, *inter alia*, notices to the public of foreclosures, adoptions, alcohol-pouring licenses,

2

and businesses filing articles of incorporation. All of the newspapers published by Rome News Media, including CCN, are members of the Georgia Press Association.[2]

On November 30, 2017, Catoosa County's probate judge, sheriff, and clerk of court, passed a resolution changing the legal organ of Catoosa County from CCN to the Chattanooga Times with an effective date of January 1, 2018.[3] The Chattanooga Times is a daily newspaper that serves the metropolitan area of Chattanooga, which includes some counties in north Georgia and Alabama. And the north Georgia area, which includes Catoosa County, is a significant portion of the Chattanooga Times's service area. Indeed, out of approximately 60,000 subscribers to the Chattanooga Times's Sunday newspaper, 13,000 subscribers live in Georgia and 5,000 of those subscribers live in Catoosa County. The Chattanooga Times offers various subscription options for a range of prices, including options to receive the paper daily, weekly on Wednesdays, only on Sunday, or only on weekends (*i.e.*, Friday,

---

[2] The Georgia Press Association, a nonprofit association composed of 139 daily and weekly newspapers, filed an amicus brief in support of CCN. We thank the GPA for its thoughtful submission.

[3] *See* OCGA § 9-13-142 (c) (providing that "[a]ny selection or change in the official organ of any county shall be made upon the concurrent action of the judge of the probate court, the sheriff, and the clerk of the superior court of the county or a majority of the officers. . . .").

Saturday, and Sunday). Additionally, the Chattanooga Times has two reporters solely dedicated to reporting news from Catoosa County and north Georgia, one of whom is a resident of the County. Since 2005, the Chattanooga Times has also leased a distribution center in Ringgold with employees who live in Catoosa County. But before the newspaper is distributed, the articles written by the Chattanooga Times's reporters assigned to the north Georgia area are sent to Chattanooga, where the newspaper is edited, published, and printed.[4]

In the years prior to the passage of the November 2017 resolution, the section of CCN that included the legal advertisements was distributed for free to every household in the County. But when CCN decided to cease distributing this portion of the newspaper at no charge, the County sheriff, probate judge, and clerk of court became concerned that, depending on CCN's distribution rates, fewer residents would have access to the legal advertisements. Given these concerns, the County officials met with representatives of CCN, who explained that publishing the free weekly newspaper was no longer cost effective, and CCN could not stay viable and continue

---

[4] The director of finance and operations for the Chattanooga Times testified that the paper is "published and printed" in Chattanooga. But as discussed below, the meaning of the word "published" in the relevant statute is a question of law for the Court. *See infra* notes 6-7 & accompanying text.

4

to publish the free newspaper. According to the sheriff, the decision to change the County's legal organ to the Chattanooga Times was based solely on an effort to provide access to the legal advertisements to as many residents of Catoosa County as possible. And in the time leading up to the passage of the resolution, the County's probate judge reviewed the relevant statutes and determined that the Chattanooga Times satisfied the statutory eligibility criteria to be the official legal organ of Catoosa County. In connection with passing the resolution, the same Catoosa County officials issued a press release and published a legal notice in the CCN, informing the public of the change and providing several reasons for their decision.

On December 12, 2017, CCN filed a complaint against Catoosa County for a temporary restraining order, an interlocutory and permanent injunction, a declaratory judgment, and a writ of mandamus.[5] Specifically, CCN sought a temporary restraining order and an interlocutory and permanent injunction, preventing the County from changing its official legal organ from CCN to the Chattanooga Times on January 1, 2018, as planned. CCN also requested a declaratory judgment that it is the only newspaper currently published in Catoosa County, that the Chattanooga Times is not

---

[5] CCN also sought attorney fees, but the trial court indicated that it would decide that claim separately, and it is not at issue in this appeal.

5

published in Catoosa County, and that the Chattanooga Times had not been published in the County for the previous two years. As to the writ-of-mandamus claim, CCN sought a court order compelling the individual county-officer defendants to rescind their designation of the Chattanooga Times as the legal organ of Catoosa County and to reinstate CCN as same.

Following a hearing, the trial court granted CCN's request for a temporary restraining order and enjoined the County from taking any action that would change the status quo with respect to all matters at issue in CCN's complaint. The trial court further ordered that the restraining order remain in effect until it conducted the interlocutory hearing and issued a subsequent order. Thereafter, the County filed its answer to the complaint, asserting numerous affirmative defenses. CCN then filed a motion for an interlocutory and permanent injunction, writ of mandamus, and declaratory judgment, essentially requesting that the temporary relief already granted become permanent. Ultimately, after holding a hearing on the matter, the trial court issued an order granting the permanent injunctive and declaratory relief requested by CCN. In doing so, the trial court concluded that the Chattanooga Times was statutorily ineligible to be the official legal organ of Catoosa County because, unlike CCN, it is not published in the County. This appeal follows.

The interpretation of a statute is a question of law, which is "reviewed de novo on appeal."[6] And when only a question of law is at issue, we owe "no deference to the trial court's ruling and apply the 'plain legal error' standard of review."[7] With these guiding principles in mind, we turn now to the County's sole claim of error.

Specifically, the County argues that the trial court erred in its interpretation of OCGA § 9-13-142 when it determined that the Chattanooga Times is not published in Catoosa County. We disagree.

When interpreting any statute, we necessarily begin our analysis with "familiar and binding canons of construction."[8] In considering the meaning of a statute, our charge as an appellate court is to "presume that the General Assembly meant what it said and said what it meant."[9] Toward that end, we must afford the statutory text its

---

[6] *Kemp v. Kemp*, 337 Ga. App. 627, 632 (788 SE2d 517) (2016) (punctuation omitted).

[7] *Id.* (punctuation omitted).

[8] *Holcomb v. Long*, 329 Ga. App. 515, 517 (1) (765 SE2d 687) (2014); *accord In the Interest of L. T.*, 325 Ga. App. 590, 591 (754 SE2d 380) (2014).

[9] *Chan v. Ellis*, 296 Ga. 838, 839 (1) (770 SE2d 851) (2015); *accord Holcomb*, 329 Ga. App. at 517 (1) (punctuation omitted); *May v. State*, 295 Ga. 388, 391 (761 SE2d 38) (2014); *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013).

plain and ordinary meaning,[10] consider the text contextually,[11] read the text "in its most natural and reasonable way, as an ordinary speaker of the English language would,"[12] and seek to "avoid a construction that makes some language mere surplusage."[13] And when the language of a statute is "plain and susceptible to only one natural and reasonable construction, courts must construe the statute accordingly."[14]

---

[10] *Holcomb*, 329 Ga. App. at 517 (1); *accord Deal*, 294 Ga. at 172 (1) (a); *see also State v. Able*, 321 Ga. App. 632, 636 (742 SE2d 149) (2013) ("A judge is charged with interpreting the law in accordance with the original and/or plain meaning of the text at issue (and all that the text fairly implies) . . . .").

[11] *Holcomb*, 329 Ga. App. at 517 (1); *see also Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 10 (II) (B) (133 SCt 2247, 186 LE2d 239) (2013) (Scalia, J.) ("Words that can have more than one meaning are given content, however, by their surroundings." (punctuation omitted)); *Deal*, 294 Ga. at 172 (1) (a) ("[W]e must view the statutory text in the context in which it appears[.]"); *Scherr v. Marriott Int'l, Inc.*, 703 F3d 1069, 1077 (II) (C) (2) (7th Cir. 2013) (Manion, J.) (noting that in statutory construction cases, courts "begin with the language of the statute itself and the specific context in which that language is used" (punctuation omitted)).

[12] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord Zaldivar v. Prickett*, 297 Ga. 589, 591 (1) (774 SE2d 688) (2015); *FDIC v. Loudermilk*, 295 Ga. 579, 588 (2) (761 SE2d 332) (2014).

[13] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *accord In the Interest of L. T.*, 325 Ga. App. at 592; *Kennedy v. Carlton*, 294 Ga. 576, 578 (2) (757 SE2d 46) (2014).

[14] *Holcomb*, 329 Ga. App. at 518 (1) (punctuation omitted); *see Deal*, 294 Ga. at 173 (1) (a) ("[I]f the statutory text is clear and unambiguous, we attribute to the

8

Turning to the statute at hand, OCGA § 9-13-142 (a) provides, in relevant part:

No journal or newspaper *published in this state* shall be declared, made, or maintained as the official organ of any county for the publication of sheriff's sales, citations of probate court judges, or any other advertising commonly known in terms of "official or legal advertising" and required by law to be published in such county official newspaper unless the newspaper shall meet and maintain the following qualifications:

. . .

(2) The newspaper shall be *published within the county* and continuously at least weekly for a period of two years or is the direct successor of such a newspaper. Failure to publish for not more than two weeks in any calendar year shall not disqualify a newspaper otherwise qualified;

(3) For a period of two years prior to designation and thereafter, the newspaper shall have and maintain at least 75 percent paid circulation as established by an independent audit. Paid circulation shall not include newspapers that are distributed free or in connection with a service or promotion at no additional charge to the ultimate recipient . . . .[15]

statute its plain meaning, and our search for statutory meaning is at an end." (punctuation omitted)).

[15] (Emphasis supplied).

And OCGA § 9-13-142 (a) (4) details how many copies per issue must be circulated within a county to be qualified to be that county's official legal organ, which is calculated based on the population of the county.[16] In sum, to be statutorily eligible to be the legal organ of Catoosa County, the Chattanooga Times must be "published" within Catoosa County *and* satisfy certain paid circulation requirements.

The parties have stipulated, and CCN concedes, that the Chattanooga Times satisfies the paid circulation requirements delineated in OCGA § 9-13-142 (a) (4). Thus, the only issue before the trial court was whether the Chattanooga Times satisfies OCGA § 9-13-142 (a) (2)'s requirement that it be "published within the county" for the requisite period of time. And without referencing any dictionary definitions of the word "publish," any relevant legal authority other than the language of the statute itself, or even the general principles of statutory construction detailed *supra*, the trial court concluded that the Chattanooga Times was ineligible to be the

---

[16] *See* OCGA § 9-13-142 (a) (4) ("Based on the published results of the 1990 United States decennial census or any future such census, the newspaper shall have and maintain at least the following paid circulation within the county for which it is designated as the legal organ newspaper: (A) Five hundred copies per issue in counties having a population of less than 20,000; (B) Seven hundred fifty copies per issue in counties having a population of at least 20,000 but less than 100,000; or (C) One thousand five hundred copies per issue in counties having a population of 100,000 or greater . . . .").

official legal organ of Catoosa County because it is not published there. As previously noted, the County argues that the trial court erred in doing so.

Except when considering a technical term or term of art in a particular industry, Georgia courts often begin by considering how a word has been defined in dictionaries to determine its plain and ordinary meaning.[17] And dictionary definitions of the word "publish" include the following:

---

[17] *See e.g.*, *Archer W. Contractors, Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (2) (735 SE2d 772) (2012) (explaining, in the context of construing a contract, that a dictionary is a useful tool for narrowing the range of meanings ordinarily attributed to a word and looking to dictionaries for accepted definitions of a word is "a good place to start"); *Miller v. Ga. Ports Auth.*, 266 Ga. 586, 586-87 (470 SE2d 426) (1996) (relying on a dictionary definition of the word "agency" to determine if the Georgia Ports Authority qualified as a "department or agency" of the state for purposes of sovereign immunity); *Monumedia II, LLC v. Dep't of Trans.*, 343 Ga. App. 49, 53 (1) n.11 (806 SE2d 215) (2017) (relying on a dictionary to determine the plain meaning of the word "outdoor"); *Mornay v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 331 Ga. App. 112, 115 (3) (769 SE2d 807) (2015) (looking to the meaning of the word "capable[,]" as defined by dictionaries, when it was not defined by the relevant statute); *Jackson v. State*, 309 Ga. App. 24, 26 (1) (a) n.7 & n.8 (709 SE2d 44) (2011) (relying on dictionary definitions of the word "obtain" in the hijacking statute because the statute does not define the word and it is not a term of art or technical term); *Belvin v. State*, 221 Ga. App. 114, 115 (470 SE2d 497) (1996) (relying on a dictionary definition of "probation officer" to determine the ordinary, logical, and common meaning of that term); *see also* OCGA § 1-3-1 (b) ("In all interpretations of statutes, the ordinary signification shall be applied to all words, except words of art or words connected with a particular trade or subject matter, which shall have the signification attached to them by experts in such trade or with reference to such subject matter.").

"[t]o make publicly or generally known; to declare or report openly or publically; to announce . . . to propagate, disseminate . . . [;]"[18]

"[t]o announce in a formal or official manner[;] . . . to proclaim[;]"[19]

"[t]o bring under public observation or notice; to give public notice of[;] . . . to expose to public view[;]"[20]

"[t]o make generally accessible or available for acceptance or use; to place before or offer to the public, now spec. by the medium of a book, journal, or the like; to make generally available a description or illustration of (an archaeological find, a work of art, etc.)[;]"[21]

"[t]o come into public circulation; to be published[;]"[22]

"[t]o prepare and issue copies of . . . [a] newspaper . . . for distribution or sale to the public[;]"[23] and

---

[18] The Compact Oxford English Dictionary 1463 (2d ed.1991).

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] The Oxford English Dictionary (3d ed.2007), http://www.oed.com/view/Entry/154072?redirectedFrom=publish#eid (last visited

"[t]o distribute copies (of a work) to the public[.]"[24]

Of these definitions, the only one to reference newspapers specifically defines "publish" as the *preparation* and *issuance* of the newspaper for distribution or sale to the public.[25] And as discussed more fully *infra*, the Supreme Court of Georgia has adopted a definition of "publish" in the context of newspaper publishing similar to this one. To be sure, in the absence of this binding precedent, a court might (at least initially) reasonably determine that the plain and ordinary meaning of the word "publish" in OCGA § 9-13-142 (a) is simply to make the contents of a newspaper publicly known or to report that information openly and publicly. But in the *context of* OCGA § 9-13-142 (a), construing the phrase "published within the county" in this manner would essentially render it meaningless. Indeed, if a newspaper satisfies the circulation requirement of the statute, it would necessarily satisfy the requirement that it be published (*i.e.*, made publicly known) within the county. And our Supreme Court recently reiterated the well-established principle of statutory construction that "courts should construe a statute to give sensible and intelligent effect to all of its

August 30, 2018).

[24] Black's Law Dictionary, 7th Edition 1246 (1999).

[25] *See supra* note 23 & accompanying text.

13

provisions and should refrain, whenever possible, from construing the statute in a way that renders any part of it meaningless."[26]

To this end, in *Carter v. Land*,[27] the Supreme Court of Georgia squarely addressed, albeit in a slightly different statutory context,[28] what it means for a newspaper to be published within a county.[29] Specifically, in *Carter*, which

---

[26] *West v. City of Albany,* 300 Ga. 743, 745 (797 SE2d 809) (2017) (punctuation omitted); *accord Footstar, Inc. v. Liberty Mut. Ins. Co.*, 281 Ga. 448, 450 (637 SE2d 692) (2006); *Sikes v. State*, 268 Ga. 19, 21 (485 SE2d 206) (1997); *see* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 176 (1st ed. 2012) ("If a [statutory] provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter shall be preferred").

[27] 174 Ga. 811 (164 SE 205) (1932).

[28] In *Carter*, our Supreme Court addressed the meaning of the phrase "published in the county" as used in a statute providing that "Sheriffs and coroners shall publish weekly, for four weeks, in some newspaper *published in their counties* respectively,—and if there be no such paper *published in the county*, then in the nearest newspaper having the largest or a general circulation in such county—notice of all sales of land and other property executed by him." *See Carter*, 174 Ga. at 813 (emphasis supplied). And as explained *supra*, in this case, we must consider the same phrase as used in OCGA § 9-13-142 (a) (2), which sets forth the requirements a newspaper must satisfy to be designated the legal organ of a county. And because both statutes use the phrase "published [with]in the county" in the specific context of newspaper publishing, we see no meaningful distinction between the phrase as construed in *Carter* and the phrase as used in OCGA § 9-13-142 (a) (2).

[29] *See Carter*, 174 Ga. at 813-14 (1).

14

coincidentally also involved Catoosa County, our Supreme Court considered whether the Catoosa County Record was published within the county for the purpose of determining whether *any* newspaper was published there.[30] As to the underlying proceedings, after learning that certain county officials were seeking to designate the Dalton News as the official legal organ of Catoosa County, the owner of the Catoosa County Record brought an action against those officials, contending that, for a number of years, it had been the official organ and *only* organ of the County and published its legal advertisements in the County.[31] But the Catoosa County Record conceded that the "mechanical work of printing the paper" was done in Walker County, roughly two miles away from the Catoosa County line.[32] The Catoosa County Record argued that, because there was already an official legal organ published within the County, the Dalton News could not be designated as the official legal

---

[30] *See id.* According to the statute at issue in *Carter*, if no newspaper is published within the county, then legal notices should be published in the nearest newspaper having the largest or general circulation in that county. *See supra* note 28.

[31] *See Carter*, 174 Ga. at 812 (Syllabus be the Court).

[32] *See id.*

organ of Catoosa County because it was published in Whitfield County.[33] Nevertheless, the trial court rejected this argument and dismissed the case.[34]

On appeal, our Supreme Court affirmed the trial court's judgment in *Carter*, identifying the issues as (1) whether the Catoosa County Record was "published within the county[,]" and (2) if not, whether it was the nearest newspaper with the largest circulation in the County.[35] In addressing these issues, the *Carter* Court first noted that "[p]ublishing a newspaper, as contemplated by the General Assembly with reference to the statute in question, means something more than the mere distribution of a newspaper[,]" or simply "having it entered at the post office for distribution."[36] The *Carter* Court then went on to explain that

> [t]he intention of the General Assembly undoubtedly was to aid in building up the locality to be served by the newspaper advertisements. Students of Georgia history are well aware of the fact that Georgians have always possessed a great degree of local pride and determination to patronize home industry and to build up local institutions. *That has been clearly shown by legislation in many instances throughout the*

---

[33] *See id.* at 813.

[34] *See id.*

[35] *See id.*

[36] *See id.* at 814 (1) (opinion).

16

*history of the state*. Keeping these facts in view, we think that act was meant to bring about, by as much as legislation could contribute, the encouragement of newspapers to own their local plant, or the payment of rent to owners of local real estate, or to encourage the employment of citizens or residents of the locality which the newpaper serves, and in turn to bring about patronage of local merchants, schools, churches, etc.[37]

Ultimately, without providing any explanation for how this analysis applied to the particular facts of the case before it, the *Carter* Court summarily concluded that the Catoosa County Register was not published within Catoosa County.[38]

Additionally, the *Carter* Court acknowledged that the meaning of the statutory phrase "published in the county" had not been previously decided in Georgia, and it expressly adopted the construction of the phrase as discussed more fully in a Montana case, *State v. Board of Commissioners of Big Horn County*[39] ("*Big Horn County*"), which provides a more detailed analysis of the issue and references other jurisdictions that have construed the pertinent phrase in a similar manner.[40] Particularly relevant

---

[37] *Id*. (emphasis supplied).

[38] *See id.* at 813-14 (1).

[39] 250 P. 606 (Mont. 1926).

[40] *See generally id.* at 607-08 (1).

to this case, in *Big Horn County*, the Supreme Court of Montana relied, in part, on a New Jersey case, which held that a newspaper was published in a city when the office of the newspaper was there and "the entire matter for the paper was composed, set up, and placed in forms at such office, and the papers were issued from there to its subscribers, . . . although the press work was done in [another city]."[41] The New Jersey court concluded that, under such circumstances, it was not relevant where "the mechanical work was done."[42] Further, in *Big Horn County*, the Supreme Court of Montana concluded that "[t]o publish a newspaper is, by common understanding, to compose, print, issue, and distribute it to the public."[43] In support, the *Big Horn County* Court explained that the "clear purpose" of the act requiring a newspaper to be published in a particular county was "to compel the letting of printing contracts to local newspapers, in order that local capital and local labor should secure the benefits of the expenditure of money derived from local taxes, including their own . . . ."[44]

---

[41] *See id.* at 608 (1) (citing *Bayer v. City of Hoboken*, 44 NJL 131 (NJ 1882)).

[42] *Id.* (relying upon *Bayer*, 44 NJL at 132-33).

[43] *Id.*

[44] *Id.* at 608-09 (1).

In other words, the word "published" refers to "a newspaper having its home in the county."[45]

Turning to the circumstances of this case, the evidence set forth *supra* establishes that, although the paper has a distribution center in Ringgold, the Chattanooga Times's "home" is, without question, located in Chattanooga, Tennessee.[46] Indeed, the director of finance and operations for the publisher of the Chattanooga Times, who is responsible for "all the business office activities in the production of the newspaper and preparing it to be sent out for circulation[,]" testified that the Chattanooga Times is "headquartered" in Chattanooga. And while the Chattanooga Times operates a distribution center in Catoosa County that employs County residents, under *Carter*, publishing a newspaper involves more than mere

---

[45] *Id.* at 609 (1). Following *Carter*, the Supreme Court of Georgia disapproved of the opinion, but only to the extent that it could be construed as holding that, to be published in a county, a newspaper must be "mechanically printed there." *Dooly v. Gates*, 194 Ga. 787, 792 (2) (22 SE2d 730) (1942). But the *Dooly* Court did not address the other reasoning set forth in *Carter* or the Montana decision it adopted. Thus, *Carter* remains good law, except to the extent that it suggests that a newspaper cannot be published within a county unless it is printed there. And given that neither CCN nor the Chattanooga Times is "mechanically printed" in Catoosa County, the Supreme Court's limited disapproval of *Carter* in *Dooly* is of no consequence in this appeal.

[46] *See supra* note 45 & accompanying text.

19

distribution of the newspaper.[47] Additionally, evidence showed that, before the "physical newspapers" are transported to distribution centers, the Chattanooga Times is edited, formatted, and issued in Chattanooga.

Although the Chattanooga Times has two reporters dedicated to the north Georgia area, including Catoosa County, they send any articles they write "back to Chattanooga" to be "edited" and "published[.]"[48] Additionally, to place a commercial advertisement in the Chattanooga Times, a person must contact the newspaper's "general [phone] number in Chattanooga." The newspaper's billing systems are also "centered" in the Chattanooga location. In sum, the evidence presented below showed that the Chattanooga Times is "composed, set up, and placed in forms at [its

---

[47] *See supra* note 36 & accompanying text. Although there was evidence that the Chattanooga Times entered a lease for office space in Ringgold that began on January 1, 2018, during the pendency of this litigation, the office space remained vacant as of the time of the February 2018 final hearing. But regardless of any publishing functions the Chattanooga Times intends to delegate to its new Ringgold office, OCGA § 9-13-142 (a) (2) requires that a newspaper be published within the county for a period of *two years* before it can be designated as the County's official legal organ.

[48] As previously mentioned, although the Chattanooga Times's director of finance testified that the newspaper was "published" in Chattanooga, the statutory meaning of the word "publish" is a question of law for the Court to decide. *See supra* note 4.

Chattanooga office] and the papers were issued from there to its subscribers."[49] And

under *Carter* (and *Big Horn County*), such evidence establishes that the Chattanooga

Times is published in Chattanooga, not in Catoosa County.[50]

Lastly, we acknowledge that, since *Carter* was decided in 1932 and the current

version of OCGA § 9-13-142 was enacted in 1999,[51] significant advancements in

technology have drastically altered the way information is disseminated from news

outlets to the public, including newspapers. Indeed, in addition to physical

newspapers published in a specific location, a growing number of news publications

are only "published" online from numerous different physical locations. Thus, while

it might be perfectly sensible to update or revise OCGA § 9-13-142 in light of these

technological advances, "it is the job of the legislature, not the courts, to rewrite or

revise statutes."[52] In any event, online publishing is not at issue in this case, and we

---

[49] *See supra* note 41 & accompanying text.

[50] *See supra* notes 36-45 & accompanying text.

[51] Ga. L. 1999, p. 6 § 2.

[52] *Walker v. Oglethorpe Power Corp.*, 341 Ga. App. 647, 668 (4) (802 SE2d 643) (2017); *see Allen v. Wright*, 282 Ga. 9, 12 (1) (644 SE2d 814) (2007) ("Court[s] may construe statutes to avoid absurd results[,] [h]owever, under our system of separation of powers . . . Court[s] do[ ] not have the authority to rewrite statutes." (punctuation omitted)); *State v. Fielden*, 280 Ga. 444, 448 (629 SE2d 252) (2006)

21

are bound by our Supreme Court's precedents regarding the statutory construction of the word "published" when it is used in references to hard copy newspapers.[53]

For all these reasons, we affirm the trial court's grant of permanent injunctive and declaratory relief to CCN.

*Judgment affirmed. Doyle, P. J., and Mercier, J., concur.*

---

("[U]nder our system of separation of powers this Court does not have the authority to rewrite statutes. The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature. We can not add a line to the law." (punctuation omitted)).

[53] *See* Ga. Const., art. VI, § VI, ¶ VI (1983) ("The decisions of the Supreme Court [of Georgia] shall bind all other courts as precedents."); *Whorton v. State*, 321 Ga. App. 335, 339 (1), 741 S.E.2d 653 (2013) (holding that "vertical stare decisis dictates that we faithfully adhere to the precedents established by the Supreme Court of Georgia"); Bryan A. Garner, et al., *The Law of Judicial Precedent* 155 ("When dealing with binding vertical precedent, a court has no room to decide how much weight or value to give each case.").