**SECOND DIVISION**
**MILLER, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 21, 2020**

# In the Court of Appeals of Georgia

A20A1480. HAGAN et al. v. HAGAN.

MERCIER, Judge.

Norvin Charles Hagan and his company, Geographics, Inc., (collectively "the plaintiffs") filed a petition for declaratory judgment against Norvin's ex-wife, Elizabeth Gould Hagan, to establish ownership of a life insurance policy that insured Norvin's life. The parties filed cross-motions for summary judgment, and the trial court granted summary judgment to Elizabeth, concluding as a matter of law that she owned the policy. The plaintiffs appeal. Finding no error, we affirm.

Summary judgment is appropriate when no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. See OCGA § 9-11-56 (c). We review the grant of summary judgment de novo, construing the evidence and all reasonable inferences drawn therefrom in the light most favorable

to the non-movant. See *Banks v. Brotherhood Mutual Ins. Co.*, 301 Ga. App. 101 (686 SE2d 872) (2009).

Viewed in this manner, the record shows that in late 1988 or early 1989, Norvin asked his brother, James, to take out a life insurance policy in Norvin's name that would be paid for by Geographics, with the expectation that if Norvin died, James would use the insurance money for the benefit of Geographics. James applied for the insurance policy, and, on February 7, 1989, Connecticut General Life Insurance Company ("Connecticut General") issued a whole life insurance policy to James that insured Norvin's life for $1,000,000. Geographics began paying the premiums on the policy, which listed James as both the owner and beneficiary.

Norvin and Elizabeth married on July 10, 1993. The following year, Norvin requested that James "change some of the details of the policy." According to Norvin, he simply wanted James to designate Elizabeth as the policy's beneficiary. James, however, understood from Norvin that he was to designate Elizabeth as the beneficiary *and* transfer ownership of the policy to her. To this end, James was provided with a Connecticut General form entitled "Ownership/Assignment Designation," which offered four options (A through D) for transferring ownership or assigning rights under the policy. The form that James received selected Option B

2

– "DESIGNATION OF BENEFICIARY AND TRANSFER OF OWNERSHIP." As specified by the form, this option was to be used "ONLY if the new beneficiary and the owner are to be the same." It further provided:

> "In accordance with the terms of the above policy, I/we hereby transfer ownership of this policy together with all rights and privileges of ownership and the right to receive all amounts payable during the Insured's lifetime to, and hereby request that the beneficiary be changed to the person(s) or entity(ies) designated on SIDE 2."

Side 2 of the form included a section entitled "Designation of Transferee/Assignee," which specified that the section was to be completed with the "[n]ame of transferee/assignee/subowner." The section was filled in with two lines of typewritten text. The first line stated: "Beth Gould Hagan, wife". That entry was crossed through. The text on the second line stated "Elizabeth Lynn Gould, wife," and was immediately followed with the handwritten initials "ELG" and date of "2/10/94." Nothing further appeared in that section.

Elizabeth testified that she crossed out "Beth Gould Hagan" on the form because she had not yet changed her name following the marriage, and she initialed and wrote the date next to "Elizabeth Lynn Gould." She also placed her social security number on the form on a line marked "New Owner/Assignee Tax ID." She

3

did not sign on the blank line designated "New Owner/Assignee." James, however, signed the form as "Transferor/Assignor"on February 20, 1994.

The Ownership/Assignment Designation form was submitted to Connecticut General and, on March 2, 1994, Connecticut General recorded what it termed a "Transfer of Ownership." Thereafter, both Connecticut General and the Lincoln National Life Insurance Company ("Lincoln"), which became the assignee and successor-in-interest to Connecticut General in 1998, listed Elizabeth as the owner of the policy.[1]

Elizabeth and Norvin divorced in 2003. According to Elizabeth, she had forgotten about her ownership interest in the policy by the time of the divorce and thus did not claim the policy as an asset. Shortly after the divorce, however, she received a tip from someone at Geographics that Norvin "forgot to do something." She began digging around for lost assets and, in 2016, found the life insurance policy when she called Lincoln and asked whether the company had an insurance policy associated with her social security number. After discovering the policy, Elizabeth took out $270,000 in cash loans against the policy.

---

[1] In 1998, Elizabeth's name on the policy was changed from Elizabeth L. Gould to Elizabeth G. Hagan.

4

The plaintiffs subsequently filed a petition for declaratory judgment against Elizabeth, seeking a declaration that Elizabeth had no ownership interest in the insurance policy. In their view, the Ownership/Assignment Designation form "did NOT effect a valid assignment or transfer of ownership of the Policy" because Elizabeth never signed the form. They thus claimed that James maintained ownership of the policy until 2018, when he purportedly assigned and transferred that interest to Geographics. The trial court rejected this claim, finding as a matter of law that Elizabeth was the sole owner of the policy. It thus granted her motion for summary judgment and denied the plaintiffs' cross-motion. This appeal followed.

1. Before we reach the merits of the plaintiffs' appeal, we must first address Elizabeth's motion to dismiss. The record shows that references to the parties' divorce permeated the proceedings below, with both sides claiming that the divorce settlement agreement and final divorce decree acted as res judicata and/or collateral estoppel on various issues. And in resolving the cross-motions for summary judgment, the trial court not only concluded that James transferred ownership of the policy to Elizabeth in 1994, it also found, based on provisions of the divorce decree and settlement agreement, that the plaintiffs were judicially estopped from challenging Elizabeth's ownership.

5

Citing these divorce references, Elizabeth argues that this is a domestic relations action subject to the discretionary appeal procedures in OCGA § 5-6-35 (a) (2). She further claims that the plaintiffs' failure to follow the required procedures demands dismissal of the appeal. We disagree.

It is well-established that appeals from "judgments or orders in divorce, alimony, and other domestic relations cases"[2] must be made by application for discretionary appeal. See OCGA § 5-6-35 (a) (2). When "the underlying subject matter, i.e., the issue sought to be appealed, clearly arises from or is ancillary to divorce proceedings, or is derived from a marital relationship and divorce, the appeal

_____

[2] A "domestic relations action" is defined as

> any action for divorce, alimony, equitable division of assets and liabilities, child custody, child support, legitimation, annulment, determination of paternity, termination of parental rights in connection with an adoption proceeding filed in a superior court, any contempt proceeding relating to enforcement of a decree or order, a petition in respect to modification of a decree or order, an action on a foreign judgment based on alimony or child support, and adoption. The term "domestic relations action" shall also include any direct or collateral attack on a judgment or order entered in any such action.

OCGA § 19-1-1 (a).

6

is within the ambit of [OCGA § 5-6-35 (a) (2)]." *Russo v. Manning*, 252 Ga. 155, 155 (312 SE2d 319) (1984); see also *Rebich v. Miles*, 264 Ga. 467, 469 (448 SE2d 192) (1994) ("[T]he underlying subject matter generally controls over the relief sought in determining the proper procedure to follow to appeal.").

The primary issue before us, however, is whether James transferred the life insurance policy to Elizabeth in 1994. This contract-based question is not derived from or ancillary to the divorce that took place nine years later. It is a completely separate issue involving conduct unrelated to the divorce and a party (James) who was not involved in the divorce proceeding. We recognize that the plaintiffs also enumerate as error the trial court's alternative res judicata/collateral estoppel ruling, which analyzed language in the final divorce decree and settlement agreement. But even if such ruling could be viewed as ancillary to the divorce proceeding, this is at best a "hybrid" case that raises both a domestic relations issue *and* a non-domestic relations contract issue relating to ownership of the life insurance policy.

The (at best) hybrid nature of this appeal prevents it "from being considered a 'domestic relations' case which is otherwise subject to OCGA § 5-6-35 (a) (2)." *Eickhoff v. Eickhoff*, 263 Ga. 498, 500 (1) (435 SE2d 914) (1993), overruled on other

grounds by *Lee v. Green Land Co.*, 272 Ga. 107 (527 SE2d 204) (2000). As explained by our Supreme Court:

> [I]f the sole issue to be resolved on appeal concerns "domestic relations," the appeal is clearly from a "domestic relations" case and must be taken to the appropriate appellate court pursuant to OCGA § 5-6-35 (a) (2). If, however, additional issues which would otherwise be directly appealable are also to be resolved on appeal, the appeal is not from a "domestic relations" case. Under those circumstances, the case is directly appealable to the appropriate appellate court and the "domestic relations" issue can then be raised pursuant to OCGA § 5-6-34 (d). Under that statutory provision, a "domestic relations" issue may be reviewed on direct appeal, when it is appealed as part of a judgment that is directly appealable.

Id. at 499 (1) (emphasis, citation, and punctuation omitted). Compare *Duffy v. Sanders*, 354 Ga. App. 684, 685-686 (841 SE2d 415) (2020) (discussing *Eickhoff*, but concluding that the appeal was solely a domestic relations case and thus subject to the discretionary appeal procedures in OCGA § 5-6-35 (a) (2)).

Because this appeal involves an issue other than domestic relations, the plaintiffs were not required to follow the discretionary appeal procedures to challenge the trial court's summary judgment ruling. See *Eickhoff*, supra. Elizabeth's motion to dismiss the appeal, therefore, is denied.

8

2. In their first enumerated error, the plaintiffs claim that the trial court erred in finding that James transferred ownership of the life insurance policy to Elizabeth in 1994 via the Ownership/Assignment Designation form. Asserting that James's assignment of ownership rights was invalid, they contend that Elizabeth has no ownership interest in the policy. This argument lacks merit.

As the policy owner in February 1994, James was entitled to "exercise all rights and privileges under the policy including the right to . . . transfer all rights and privileges to another person, and . . . assign the policy." More specifically, the policy states that an owner "may transfer all rights and privileges of [o]wner" and that on the effective date of such transfer, "the transferee will become the [o]wner and will have all the rights and privileges of [o]wner." It also provides:

> A transfer of [o]wner . . . must be in writing or on a form satisfactory to the Company and filed at the Home Office. A transfer . . . will not take effect until recorded in writing by the Company. When a transfer . . . has been so recorded, it will take effect as of the effective date specified by the [o]wner.

The undisputed evidence shows that James executed the Ownership/Assignment Designation form on February 20, 1994, clearly naming Elizabeth as both the new owner of the policy and the new beneficiary. Connecticut

9

General recorded the transfer less than two weeks later, after which the insurer's records reflected Elizabeth as the owner. Under the plain terms of the insurance policy, the Ownership/Assignment Designation form was recorded by the insurer and, therefore, took effect.

Nevertheless, the plaintiffs challenge the form's validity, arguing that it was ineffective to transfer ownership because Elizabeth did not sign the form or expressly agree to the transfer. Nothing in the policy language, however, required her signature or express agreement. In fact, the policy states that an owner may transfer his or her rights and privileges "without the consent of any designated transferee, or any [b]eneficiary if the [o]wner has reserved the right to change the [b]eneficiary."

Parsing this policy language, the plaintiffs claim that a transfer without the transferee's consent can occur only if the "[o]wner has reserved the right to change the [b]eneficiary." They thus argue that because James did not reserve this right when he executed the Ownership/Assignment Designation form, express consent from Elizabeth was required. We disagree.

When construing an insurance contract, we must view the policy as a whole and read the policy "as a layman would read it[.]" *Banks*, supra at 103 (1) (citation and punctuation omitted). The plaintiffs' strained reading of the policy language

ignores this principle. Rather than offsetting the words "any [b]eneficiary" with two commas, the policy includes only a single comma after the word "or" and before "any [b]eneficiary." This use of a single comma indicates that the consent requirements for "any designated transferee" and "any [b]eneficiary" are different. While a transferee need not consent to an owner's decision to transfer his or her rights and privileges under the policy, a beneficiary must consent unless the owner reserves the right to change the beneficiary. In other words, the phrase "if the [o]wner has reserved the right to change the [b]eneficiary" modifies and limits "any [b]eneficiary," not "any designated transferee." See *Deal v. Coleman*, 294 Ga. 170, 172-174 (1) (a) (751 SE2d 337) (2013) (analyzing placement of commas to discern plain meaning of statutory language); *J. Kinson Cook, Inc. v. Weaver*, 252 Ga. App. 868, 870 (1) (556 SE2d 831) (2001) ("[T]he absence of offsetting commas suggests that a phrase modifies only the language immediately adjoining.").

Moreover, even if the policy language required Elizabeth's consent, the evidence shows that she consented to the assignment in 1994. Although she did not sign the Ownership/Assignment Designation form, "assent may be implied from the circumstances and the conduct of the parties." *Thomas v. Chance*, 325 Ga. App. 716, 718 (754 SE2d 669) (2014) (citation and punctuation omitted). Shortly before James

11

executed the form, Elizabeth placed her initials next to her typewritten name in a section of the form entitled "Designation of Transferee/Assignee." She also provided her social security number on a line marked "New Owner/Assignee Tax ID," under which the form states: "Please include the owner/assignee's complete Taxpayer Identification Number for interest reporting purposes." Finally, the form on which Elizabeth placed her initials and social security number clearly designated Elizabeth as the new beneficiary *and* owner of the policy.

The plaintiffs have pointed to no evidence that Elizabeth rejected or did not agree to the ownership transfer in 1994. On the contrary, she testified that "[a]t that point," she thought she was the owner of the policy. And she recalled that when she read the Ownership/Assignment Designation form in 1994, she understood that ownership of the policy "was being transferred to [her]." Elizabeth did not remember why she failed to sign the form. But nothing in the policy language demanded a signature, and Connecticut General not only recorded the form as submitted, but changed its records to reflect Elizabeth as the owner. Given these circumstances, the plaintiffs have not demonstrated that the blank signature line undermined the 1994

transfer[3] or evidenced any lack of consent by Elizabeth. Compare *Lake v. Young Harris Alumni Foundation*, 283 Ga. App. 409, 410-412 (1) (641 SE2d 628) (2007) (change-of-beneficiary form that insurance policy owner/insured failed to sign was insufficient to change beneficiary where insurer returned form to the owner/insured for signature).

The plaintiffs also argue that, regardless of whether the Ownership/Assignment Designation form met policy requirements, the form did not transfer ownership because, under Georgia law, a transferee/assignee must agree or assent to undertake the responsibilities and obligations of the policy owner. It is true that "[a]n assignment is a contract and, in order to be valid, must possess the same requisites (parties, subject matter, mutual assent, consideration) as any other contract." *Bank of Cave Springs v. Gold Kist*, 173 Ga. App. 679, 680 (1) (327 SE2d 800) (1985). Even

_____

[3] On appeal, the plaintiffs cite us to a 2019 affidavit filed by a Lincoln employee, who averred that Lincoln "[c]urrently" requires a transferee to sign a change of ownership form. The plaintiffs claim that this evidence "suggest[s]" that Connecticut General should have rejected the Ownership/Assignment Designation form absent Elizabeth's signature. The Lincoln employee also testified, however, that Lincoln "is not in possession of any [Connecticut General] standard forms, policies, or procedures related to changes in policy ownership that were effective in or around 1994." The plaintiffs have cited no evidence that Elizabeth's signature was *required* by Connecticut General's 1994 policies or procedures or that Connecticut General found the Ownership/Assignment Designation form unacceptable.

13

if Georgia assignment law applies here, however, we have already determined that the circumstances surrounding execution of the Ownership/Assignment Designation form in 1994 demonstrate, as a matter of law, Elizabeth's assent to the transfer of ownership. See *Thomas*, supra ("[T]he circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement." (citation and punctuation omitted)).

By virtue of the 1994 Ownership/Assignment Designation form, Elizabeth is the owner of the life insurance policy at issue. The trial court, therefore, properly granted summary judgment to Elizabeth and denied the plaintiffs' cross-motion for summary judgment.

3. In light of our decision in Division 2, we need not address the plaintiffs' remaining claims of error, which challenge the trial court's alternative ground for granting summary judgment to Elizabeth.

*Judgment affirmed. Miller, P. J., and Markle, J., concur.*

14